## S09A1083. HOWARD v. THE STATE.

### (686 SE2d 764)

NAHMIAS, Justice.

Richard Howard was jointly indicted with his cousin, Tandy Cole, for numerous crimes, including murder, stemming from the shooting death of Larry Ritch. Cole's trial was subsequently separated from Howard's, and Cole testified against Howard. A jury found Howard guilty on all counts. Howard now appeals, contending, among other things, that the trial court erred by precluding him from questioning Cole about the possible sentences he might face if he were subsequently prosecuted. We find no merit to this contention or the others raised by Howard, and we therefore affirm.[1]

1. Josh Silverman worked with Ritch at a restaurant in Atlanta. After work on July 7, 2007, they decided to go out for the evening. Ritch drove to Silverman's apartment on the north side of Atlanta about 11:45 p.m., and called Silverman to buzz him through the main gate at the apartment complex. Ritch came through the main gate, and Silverman went to his balcony to watch for Ritch's car. Silverman remained on the cell phone with Ritch. As Ritch's car approached, Silverman saw a dark, four door Chevrolet Impala with "distinctive" blue headlights following Ritch very closely. Ritch parked his car, and the Impala quickly parked near Ritch. Silverman testified that, from his balcony, he could clearly see the Impala. According to Silverman, the driver of the Impala immediately got out of the car, "ran up on [Ritch]," and demanded his money. At this point, Silverman was still on the cell phone with the victim and was about 15 yards from Ritch's car. Silverman said he could hear the conversation between Ritch and the driver through his cell phone and orally from where he was standing. The driver was about six feet tall, about 165 pounds, had a "lean frame," and was wearing dark clothes. The passenger in the Impala got out of the car, walked to the driver's side, got in the driver's seat, and closed the door. According to Silverman, this person was wearing glasses, a white do-rag, and a white or light-colored shirt and was "a big guy." (Cole is 6'6" tall and

---

[1] The crimes occurred on July 7, 2007, and Howard was indicted on October 1, 2007, for malice murder, felony murder, aggravated assault, criminal attempt to commit armed robbery, and possession of a firearm during the commission of a felony. A jury found Howard guilty on all counts on March 27, 2008, and that same day, the trial court sentenced Howard to life in prison for malice murder, to 30 consecutive years for the robbery conviction, and to five consecutive years for the firearm possession. The felony murder conviction was vacated as a matter of law, and the trial court merged the aggravated assault conviction with the malice murder conviction. Howard filed a motion for new trial on April 4, 2008, and an amended motion on August 27, 2008. The trial court denied the motion for new trial, as amended, on January 29, 2009. Howard filed his notice of appeal on February 17, 2009, and the appeal was docketed in this Court on March 23, 2009. The case was orally argued on June 8, 2009.

weighs 320 pounds.) Silverman went down the stairs to help Ritch, and when he was outside his apartment building on the ground floor, he saw the person who was the initial driver of the Impala shoot Ritch numerous times. The shooter then ran to the passenger side of the Impala and jumped in, and the car sped away. Silverman called 911. Silverman did not identify Howard before trial or at trial as the shooter. Ritch had been shot five times; two of the gunshots were fatal.

Augusta Jones testified that she was at the apartment complex when she heard gunshots and looked up and saw that the shooter was wearing a dark-colored shirt with wide orange stripes. She also testified that the shooter was about six feet tall and about 160-180 pounds. Jones added that a shirt that was taken from Howard's car later that night was similar to the shirt she saw the shooter wearing. Jones testified that the shooter did not have on a white do-rag, was not wearing glasses, and was not wearing the light-colored shirt that Cole was wearing when he was arrested later that night.

Nicolas Hanlon was working at the apartment complex and heard the gunshots. He testified that he jumped into his car and drove to the main gate to see if he could locate a vehicle leaving the area. He saw a dark-colored, four door sedan with tinted windows and blue headlights leaving the complex. Two people were in the car. Hanlon wrote down the license number and gave it to the police.

A police officer who was driving a few miles from the apartment complex received a call that a shooting had happened there and that he should be on the lookout for a dark-colored sedan with blue headlights, with one of the suspects wearing a white do-rag and glasses. About five to ten minutes later and about two and a half miles from the apartment complex, he saw a car that fit that description, and he pulled up next to it at a traffic light. He noticed that the passenger in the car was wearing a white do-rag and glasses. The officer followed the car until it pulled into a gas station, where he saw Howard get out of the car. After back-up arrived, the officers arrested Howard and Cole and found a black handgun underneath the seat. A dark, striped shirt was found in the back seat of the car, and the license tag on the car matched the tag number reported to the police by Hanlon.

Cole testified against Howard at trial. Cole said that he understood that his trial had been severed from Howard's, that he was charged with the same crimes as Howard, and that he did not have any deal regarding charges or sentences with the State in exchange for his testimony. Cole testified that Howard called him on the evening of the crimes and asked him if he wanted to go out. Howard picked up Cole in his black Impala about 6:00 p.m. Howard was wearing a dark-colored, striped shirt, and Cole was wearing silver

sunglasses and a white do-rag. They first went to a friend's apartment and drank some alcohol and talked. About 9:30 to 10:00 p.m., they went to a party in Hapeville, Georgia, on the south side of Atlanta.

Cole testified that, once they left that party, he fell asleep in Howard's car. When Cole awoke, he was unsure where they were, but Howard was driving through a gate at an apartment complex. Howard told Cole that he was intoxicated and wanted Cole to drive. Howard parked the car and got out, and Cole also got out, walked to the driver's seat, got in the car, and began changing the CD player. Cole added that he was not paying attention to what Howard was doing, but that less than a minute later, he heard gunshots. Howard then jumped in the passenger seat and said "drive." Cole asked Howard what happened, and Howard, in a "panicky" voice, responded, "man, just drive." Howard took off his striped shirt and threw it in the back seat of the car, and they left the apartment complex. Cole drove to a nearby parking garage where Howard suggested that he drive. Cole and Howard switched positions. Shortly after that, Howard told Cole that a guy had tried to grab him and that he had shot the guy. Cole added that police cars started following them, and that Howard drove into a gas station where they were arrested.

A gun store owner testified that he sold the gun found in the car to Howard, and forensic evidence showed that the five shell casings found at the crime scene were fired from the handgun found in the car.

Viewed in the light most favorable to the verdict, the evidence was easily sufficient for the jury rationally to have found Howard guilty beyond a reasonable doubt of the crimes of which he was convicted. *Jackson v. Virginia*, 443 U. S. 307, 318-319 (99 SC 2781, 61 LE2d 560) (1979).

2. As previously mentioned, Cole had no deal with the State regarding charges or sentences in exchange for his testimony. Before he testified, the trial court ruled that Howard could question Cole about the charges pending against him, but not about the possible sentences he faced for those charges. Howard contends this ruling was error.

Howard relies primarily on *State v. Vogleson*, 275 Ga. 637 (571 SE2d 752) (2002). In *Vogleson*, an accomplice pled guilty before Vogleson's trial and agreed to testify against Vogleson in exchange for a specific reduced sentence. The trial court permitted Vogleson to cross-examine the witness about his plea to a lesser offense, but did not permit Vogleson to question the witness "about his understanding of the disparity between the sentence the State would recommend in exchange for his cooperation and the sentence he would

have received without that cooperation." Id. at 638. This Court ruled that the failure to permit Vogleson to cross-examine the accomplice about this objective evidence of a benefit violated Vogleson's Sixth Amendment right of confrontation. Id. at 639-642.

We conclude, however, that this case is controlled by *Watkins v. State*, 276 Ga. 578 (581 SE2d 23) (2003), not *Vogleson*. In *Watkins*, a key witness against Watkins had criminal charges pending against her at the time of Watkins's trial, but had no deal with the State regarding those charges in exchange for her testimony. Id. at 581. The trial court permitted Watkins to cross-examine the witness generally about any possible bias or hope of benefit she might have because of her testimony, but denied Watkins's request to cross-examine the witness regarding the nature of the pending charges (and thus, implicitly, the possible punishment for those charges). Id. at 581-583. Watkins contended that this restriction violated his right of confrontation, but this Court disagreed. We noted that "[t]he right of cross-examination integral to the Sixth Amendment right of confrontation is not an absolute right that mandates unlimited questioning by the defense," id. at 582, and that "[t]he Confrontation Clause guarantees 'only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish,'" id. (quoting *United States v. Oliver*, 278 F3d 1035, 1041 (10th Cir. 2001)). Because "the jury learned through defense counsel's cross-examination that [the witness] had charges currently pending against her, that she had been indicted by a grand jury, and the month and year when she had been indicted," because defense counsel questioned the witness about "whether her testimony at trial was related to the pending charges against her," and because the only limitation on cross-examination concerned the specific nature of the pending criminal charges, we found no error. Id. at 582-583. We distinguished *Vogleson* because the witness had not obtained a concrete benefit for her testimony by which an objective comparison could be made to her potential sentences. Id. at 581.

This case is easier than *Watkins*. Here, Cole had no deal regarding his charges or sentences with the State in exchange for his testimony, and the trial court permitted an even more sweeping cross-examination, limiting only questions about the specific sentences that Cole might face. Unlike the limitation upheld in *Watkins*, Howard was allowed to elicit that Cole was charged with the same murder, the same aggravated assault, and the same attempted armed robbery as Howard and that those charges were still pending. Thus, while the jury was not informed about the specific sentences facing Cole — and facing Howard, as to whom such punishment information, offered directly, would clearly be inadmissible, *Bellamy v. State*,

272 Ga. 157, 160 (527 SE2d 867) (2000) — the jury knew Cole faced very serious charges like murder that obviously can carry significant sentences. Howard also cross-examined Cole regarding whether he hoped to gain favorable treatment on the charges due to his testimony. In response, Cole admitted several times that, although he had no deal with the State, he hoped the charges against him would be *dismissed* because of his testimony — a benefit far greater than any sentence reduction.

Accordingly, the trial court did not abuse its discretion in precluding Howard from asking Cole about the specific sentences he would face if convicted of the charges against him.

3. Howard contends that the trial court erred in refusing to permit him to introduce two items of evidence that he contends were relevant to support his defense that Cole was the shooter.

(a) Howard first argues that the trial court erred in declining to permit him to play for the jury an audiotape[2] of Cole sitting in a patrol car after his arrest and talking to himself. On the audiotape, Cole asked for God's forgiveness for the "actions that led him to the back of this patrol car," stated that "this is the path I chose to take, I'll have to suffer the consequences," and talked about what had happened earlier in the evening. Howard concedes that the trial court permitted him to cross-examine Cole about these statements, but claims he should have been allowed also to play the audiotape because it was relevant to show that someone else committed the crimes and would have conveyed Cole's demeanor and tone of voice better than the in-court cross-examination.

Howard proffered a condensed ten-minute DVD of Cole's time in the back of the patrol car, which amounted to well over an hour. Apart from the ten minutes condensed by Howard, Cole was silent. The prosecutor provided the trial court with a copy of the full DVD recording. The trial court questioned Howard about what he was offering the DVD for, noting that at one point on the recording, Cole asked an officer, "Did the guy die who my cousin just shot?" Although unclear, it appears the trial court excluded the audiotape as lacking relevance.

"Although a trial court has discretion in determining the admissibility of evidence, the long-standing rule in this state favors the admission of any relevant evidence, no matter how slight its probative value." *Richardson v. State*, 276 Ga. 639, 642 (581 SE2d 528) (2003). And "[g]enerally, evidence implicating another named indi-

---

[2] Although there was a video recording device in the officer's car, the camera was not trained on the interior of the police car and thus Cole can be heard but not seen on the recording. For the sake of clarity, we will refer to the recording as an audiotape.

vidual as the actual perpetrator of the crime is relevant and admissible as tending to exonerate the defendant." *Azizi v. State*, 270 Ga. 709, 714 (512 SE2d 622) (1999). Accord *Dawson v. State*, 283 Ga. 315, 316 (658 SE2d 755) (2008).

In this case, however, even assuming the trial court abused its discretion in excluding the audiotape, any error was clearly harmless. First, Howard cross-examined Cole extensively both about the substance of his statements in the back of the patrol car and his purpose in saying them out loud, including asking Cole whether he was "making up a story to tell the detectives" and practicing so that he could mislead the police. In the absence of any claim that Cole's demeanor or tone on the audiotape contradicted his live testimony, the probative value of the additional audiotape evidence would be minimal. The statements were not on their face incriminating of Cole being the shooter, as opposed to his being a participant in the events of that night, which Cole admitted, and he in fact implicated Howard as the shooter. On the other hand, the evidence against Howard was strong, including evidence of the significant disparity in size between Cole and Howard and evidence from two eyewitnesses that the smaller, leaner person was the shooter, as well as the difference in what the shooter was wearing as compared to the larger person and the fact that Howard's gun was used in the shooting. See *Oree v. State*, 280 Ga. 588, 593 (630 SE2d 390) (2006).

(b) Howard also contends that the trial court erred in refusing to permit him to introduce computer images from Cole's MySpace website that Howard claims were relevant to show that Cole shot the victim. At trial, Howard informed the trial court only that he had one image from Cole's MySpace website that depicted Cole holding a rifle, with a caption saying that "a pistol equals respect." Howard contended that this image was relevant evidence that Cole committed the offense in question. On appeal, Howard also discusses another image showing Cole as a child, with the caption, "How could this face be guilty?" Howard never informed the trial court about this second image, and, consequently, he is barred from contending on appeal that the court erred by excluding it. See *Fuss v. State*, 271 Ga. 319, 321 (519 SE2d 446) (1999). Furthermore, even assuming that Howard could authenticate the image of Cole holding a rifle or the caption that accompanied it, the fact that at some point Cole created such an image or caption would only raise a speculative or conjectural inference that he murdered Ritch on the night in question. This Court has held that such weak inferences are inadmissible to show that another person committed the crime in question. *Dawson*, 283 Ga. at 316-317. Accordingly, the trial court did not err in excluding the evidence.

4. Howard contends the trial court erred in prohibiting him from

calling an eyewitness identification expert to testify as to the issues affecting the reliability of eyewitness testimony. We disagree.

If

> eyewitness identification of the defendant is a key element of the State's case and there is no substantial corroboration of that identification by other evidence, trial courts may not exclude expert testimony without carefully weighing whether the evidence would assist the jury in assessing the reliability of eyewitness testimony and whether expert eyewitness testimony is the only effective way to reveal any weakness in an eyewitness identification.

*Johnson v. State*, 272 Ga. 254, 257 (526 SE2d 549) (2000). The admission or exclusion of this evidence, however, is within the sound discretion of the trial court, and the exercise of that discretion will not be disturbed on appeal absent clear abuse. Id.

In this case, there was substantial corroboration of the eyewitness identifications by Silverman and Jones.[3] Cole's testimony, for example, entirely corroborates the eyewitnesses' identifications. Moreover, another witness, who heard but did not see the shooting, gave a description of the shooter's car that matched that given by the eyewitnesses and wrote down the car's license plate number. The car was stopped by the police within minutes, the license plate number matched that given by the witness, the driver of the car fit the eyewitnesses' description of the shooter, the passenger in the car fit the description of the person that Silverman saw moving from the passenger seat to the driver's seat during the shooting, and a shirt was found in the back seat that matched Jones's description of the shirt worn by the shooter. Furthermore, the murder weapon was found in Howard's car, and the owner of a gun store testified he sold the gun to Howard. Because the eyewitness identifications were substantially corroborated, the trial court did not abuse its discretion in excluding the expert testimony. *Davis v. State*, 286 Ga. 74 (686 SE2d 249) (2009).

5. Howard contends the trial court erred by prohibiting him from asking prospective jurors whether they would be biased if they heard evidence of driving under the influence or illegal drug use. Although the court did sustain the State's objection to asking prospective jurors about specific evidence that might be involved in

---

[3] Due to darkness, neither of the eyewitnesses could identify Howard as the shooter. They could only identify his body size, his clothing, and the car he was in. We assume, for purposes of Howard's argument, that the eyewitnesses' testimony constitutes eyewitness identification within the meaning of *Johnson*.

the case, the court allowed Howard to thoroughly question jurors about whether they had a strong bias against driving after consuming alcohol and against the use of illegal drugs, whether they or anyone they knew had suffered from the use of alcohol or illegal drugs, and whether, if the prospective juror had a bias, he or she could set aside that bias and be an impartial juror.

"The scope of voir dire and the propriety of particular questions are left to the sound discretion of the trial court. The trial court's rulings regarding the conduct of voir dire will not be disturbed on appeal absent some manifest abuse of discretion." *Hamilton v. State*, 274 Ga. 582, 583 (555 SE2d 701) (2001) (citations omitted). Because the trial court permitted Howard to ask wide-ranging questions about the use of alcohol and illegal drugs and any bias on this subject, the court did not abuse its discretion in controlling the scope of voir dire.

Howard also contends the trial court erred in rehabilitating a particular juror. The record, however, shows that the court's questions were "objective and calculated to clarify" the prospective juror's views. *Anderson v. State*, 276 Ga. 389, 390 (578 SE2d 890) (2003). Accordingly, the trial court did not engage in improper rehabilitation of the juror. Id.

*Judgment affirmed. All the Justices concur.*

DECIDED NOVEMBER 23, 2009.

*Pate & Brody, Page A. Pate, Bernard S. Brody*, for appellant.
*Gwendolyn Keyes Fleming, District Attorney, Leonora Grant, Assistant District Attorney, Thurbert E. Baker, Attorney General, Sheila E. Gallow, Assistant Attorney General*, for appellee.