S09A1766. MIKELL v. THE STATE.
(689 SE2d 286)

HUNSTEIN, Chief Justice.

Fredrico Shenard Mikell was convicted of felony murder and multiple counts of armed robbery and aggravated assault arising out of an attack on six people in a home in Statesboro. He appeals from the denial of his motion for new trial[1] challenging the sufficiency of

---

[1] The crimes occurred on October 14, 2006. Mikell was indicted December 11, 2006 in Bulloch County along with Marcus Benbow, Bryan Hughley and Kendall Worthy. The 24-count indictment charged Mikell with malice murder, felony murder, burglary, six counts each of armed robbery, aggravated assault and false imprisonment, two counts of possession of a firearm during the commission of a crime (one each for the two weapons used during the crimes) and possession of a firearm by a convicted felon. The State nol prossed the final charge and two armed robbery charges. On May 22, 2008, a jury acquitted him of malice murder, burglary, the false imprisonment charges and the two firearm possession charges and found him guilty of the remaining charges. He was sentenced that same day to life for the felony murder charge, into which the trial court merged the armed robbery and aggravated assault

the evidence and asserting other errors. For the reasons that follow, we affirm.

1. The evidence authorized the jury to find that appellant guided Kendall Worthy, Marcus Benbow and a third man to a home in Statesboro where six people were inside playing or watching a dice game. Appellant went alone to the door and, after identifying himself, asked to speak to the murder victim, Corey Walker. Visible on the floor was the money paid in by Walker and the other participants in the dice game. Appellant was well known to Walker and others in the room, including Chalandria McClouden, with whose family appellant had frequently dined. Appellant asked Walker about purchasing drugs and left after learning Walker had none. Thirty to forty-five minutes later, dice game participant James Williams answered a knock on the door and was shot in the knee with a handgun as he struggled to keep out of the home a man Williams later identified as Benbow. Co-indictee Worthy then entered the home with an AK-47 assault rifle. He shot Williams in the other knee with the rifle and, as the home's unarmed inhabitants fled the gunmen, shot McClouden in the back and legs and fatally wounded Walker. McClouden testified that, after the shots were fired, she turned toward the front door and "could see [appellant] and he stood there looking at me and then he took out running." Benbow picked up the dice game money, shot Williams in the knee yet again, and then he and Worthy fled the scene, driving off without appellant.

Worthy, as part of a negotiated guilty plea deal pursuant to which he was to receive a single life sentence, testified that appellant and the other indictees came to Statesboro to commit a robbery; that appellant approached several individuals under the ruse of wanting to purchase a large amount of drugs as a means of finding someone to rob; and that Benbow, upon hearing of the victims' gambling money, proposed robbing the victims, to which appellant agreed. Worthy testified that appellant carried the assault rifle up to the door but dropped it and ran away as Benbow struggled to get inside the home; that Worthy then joined Benbow, picked up the rifle and fired it in the home after Benbow shot victim Williams at the door; and that Worthy then ran to the car, followed by Benbow with the money from the dice game, and left town.

Appellant was identified by the surviving victims and, after

charges as to the murder victim; three concurrent life sentences for the remaining armed robbery charges; and a consecutive 20-year sentence for aggravated assault with four concurrent 20-year sentences for the remaining aggravated assault charges. Mikell's motion for new trial, filed May 28, 2008 and amended March 10, 2009, was denied May 15, 2009. A notice of appeal was filed May 22, 2009. The appeal was docketed July 9, 2009 and was submitted for decision on the briefs.

being taken into custody, gave both a recorded statement, heard by the jury, and a written statement, read into evidence, in which he admitted his knowledge of and participation in the plan to commit armed robbery, including accompanying Benbow to the door, knocking on it and giving his name to gain entry into the home. However, he claimed he then hesitated and abandoned the enterprise by running away after Benbow got inside and kept on running as he heard the shots being fired.

In light of McClouden's testimony that she saw appellant in the doorway *after* the shots had been fired, we find no merit in appellant's contention that the evidence was insufficient to support his convictions because the State failed to disprove beyond a reasonable doubt his affirmative defense of abandonment. See OCGA § 16-4-5 (a) (circumstances must manifest complete renunciation of the criminal purpose to constitute affirmative defense of abandonment); *Johnson v. State*, 276 Ga. 368 (1) (578 SE2d 885) (2003). See generally *Bentley v. State*, 261 Ga. 229 (2) (404 SE2d 101) (1991) (determination whether State has met its burden to disprove an affirmative defense is for the jury). Furthermore, whether the deal made by Worthy with the State rendered his testimony biased to a degree that left him less creditworthy was a determination to be made by the jury. See *Yat v. State*, 279 Ga. 611 (1) (619 SE2d 637) (2005). The evidence adduced was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that appellant was guilty as a party to the charged crimes. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). See also OCGA § 16-2-20 (a) (party to a crime is as guilty of crime's commission as the principal).

2. The transcript reveals that the trial court permitted appellant to question Worthy exhaustively about his knowledge of his possible punishment, thereby allowing appellant to fully explore the possible motivation for Worthy's testimony. See *State v. Vogleson*, 275 Ga. 637 (1) (571 SE2d 752) (2002). Because the trial court did not violate appellant's right to confrontation under the Sixth Amendment by not allowing appellant to delve into the issue of Worthy's parole eligibility, see *Hewitt v. State*, 277 Ga. 327 (2) (588 SE2d 722) (2003) (because authority to grant parole rests with Board of Pardons and Paroles and not the district attorney's office, cross-examination regarding parole is irrelevant on question of witness's potential bias in testifying favorably for the State), no further analysis of this issue is necessary to the determination of the case at hand. See generally *Zepp v. Brannen*, 283 Ga. 395, 397 (658 SE2d 567) (2008) (discussing "obiter dicta").

3. The trial transcript clearly reflects that appellant acted in compliance with OCGA § 17-8-58 at the time he objected to the trial court's failure to give his requested charge on withdrawal from a

conspiracy.[2] However, it is reversible error for the trial court to decline to give a requested charge on an affirmative defense only where the charge is both a correct statement of the law and is adjusted to the evidence in the case. See *Bishop v. State*, 271 Ga. 291 (2) (519 SE2d 206) (1999). Appellant's requested charge tracked the language of OCGA § 16-4-9, which provides that withdrawal is a defense if the defendant can show that he withdrew *"before* [any] overt act [to effect the object of the conspiracy] occurred." (Emphasis supplied.) OCGA § 16-4-9. See also OCGA § 16-4-8 (person commits offense of conspiracy to commit a crime "when he together with one or more persons conspires to commit any crime and any one or more of such persons does any overt act to effect the object of the conspiracy"). As appellant himself admitted, prior to his alleged withdrawal from the conspiracy, he acted to lead his co-indictees to the home where the victims were present; told his co-indictees, who were seeking victims to rob, about the dice game money he observed on the floor of the home; accompanied an armed co-indictee to the home and knocked on the door; and gave his name so as to enable his armed co-indictee to gain entry when the door was opened in response to appellant's words. The conspiracy to rob the victims could not have been effected without appellant's performance of these overt acts. See generally *Bradford v. State*, 285 Ga. 1 (2) (673 SE2d 201) (2009) ("overt act" in OCGA § 16-4-8 refers to an open or manifest act made in furtherance of a conspiracy to commit a crime). Accordingly, because appellant's requested charge was not authorized by the evidence in the case, it was not error for the trial court to refuse to give it. See generally *State v. Johnson*, 280 Ga. 511 (630 SE2d 377) (2006) (requested jury charge must be legal, apt, adjusted to some principle involved in the case and authorized by the evidence).

4. Appellant failed to make a proper objection pursuant to OCGA § 17-8-58 (a) regarding the trial court's failure to charge his supplemental requests to charge numbers 1 and 2, which identified abandonment and withdrawal as affirmative defenses that the State had the burden of disproving beyond a reasonable doubt. In light of the trial court's separate instructions to the jury that "it is an affirmative defense that [a person] abandoned his efforts to commit the crime," and that "[w]hen a defense is raised by the evidence the burden is on the State to negate or disprove it beyond a reasonable doubt," we conclude that the trial court's failure to give the requested supplemental charges cannot be considered such plain

---

[2] We thus reject the State's erroneous assertion that this enumeration has not been preserved for appellate review.

error under OCGA § 17-8-58 (b) as to offset appellant's failure to object. See *Givens v. State*, 264 Ga. 522 (3) (448 SE2d 687) (1994) (when properly requested, trial court is required to give specific charge on State's burden of proof with respect to an affirmative defense). Appellate review of this enumeration is thus precluded. OCGA § 17-8-58 (b).

5. Appellant contends the prosecutor during closing argument improperly commented on appellant's pre-arrest silence in violation of *Mallory v. State*, 261 Ga. 625 (5) (409 SE2d 839) (1991) (comment upon a defendant's silence or failure to come forward is more prejudicial than probative). Under the unique situation present in this case, we find no error. The transcript reveals that, five days after the crimes were committed, police officers sought out appellant and questioned him regarding the crimes. Appellant gave a statement in which he admitted he knew of and participated in the plan to commit the armed robbery of the victims but claimed he then hesitated because of his friendship with the victims and abandoned the enterprise by running away. See Division 1, supra. During the course of this statement, appellant specifically told the interrogating detective that he was "going to call you all next week" to report what Benbow and Worthy had done to the victims. In her closing argument, the prosecutor reiterated this comment appellant had made to the interrogating detective when she argued that appellant could have but did not call the police in the days following the crimes. We hold that appellant invited the prosecutor's comment about his pretrial silence by making the statement to the interrogating officer that he had intended to call the police "next week" and thereby raised an issue regarding his failure to come forward before the interrogation that the prosecutor was legitimately authorized to address in her closing argument. Moreover, we note that the prosecutor's comments in closing argument did not exceed the scope of the invited response. Under these circumstances, we find no erroneous prosecutorial comment on silence. See generally *Morgan v. State*, 267 Ga. 203 (3) (476 SE2d 747) (1996) (closing argument is appropriate as long as it is derived from evidence properly before the factfinder).

*Judgment affirmed. All the Justices concur, except Melton and Nahmias, JJ., who concur specially.*

NAHMIAS, Justice, concurring specially.

I join the majority opinion except for Division 2, as to which I concur only in the result. I believe that more analysis than the majority provides in Division 2 is needed to properly reach the result the majority comes to on that issue. More importantly, prosecutors and trial courts could fairly read the majority opinion as authorizing

the exclusion of any and all cross-examination of the State's witnesses regarding parole eligibility, which I believe could, in some cases, result in reversible error.[3]

The trial court refused to allow appellant to cross-examine Kendall Worthy, a co-defendant who was testifying against appellant pursuant to a plea bargain with the State, regarding Worthy's parole eligibility. In quickly rejecting appellant's challenge to that ruling, the majority cites *Hewitt v. State*, 277 Ga. 327 (2) (588 SE2d 722) (2003), with the explanatory parenthetical "(because authority to grant parole rests with [the] Board of Pardons and Paroles and not the district attorney's office, cross-examination [about] parole is irrelevant on question of witness's potential bias in testifying favorably for the [district attorney])." I believe this explanation is too broad and cannot, by itself, dispose of this case.

In accordance with the decisions of the United States Supreme Court, this Court has explained that:

> "The Sixth Amendment to the [United States] Constitution guarantees the right of an accused in a criminal prosecution 'to be confronted with the witnesses against him.' . . . The main and essential purpose of [the right of] confrontation is to secure for the opponent the opportunity of cross-examination. . . . The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.' [Cit.]"

*State v. Vogleson*, 275 Ga. 637, 638 (571 SE2d 752) (2002) (quoting *Davis v. Alaska*, 415 U. S. 308, 315-317 (94 SC 1105, 39 LE2d 347) (1974)).

This principle is particularly important with witnesses who have substantial incentives to cooperate with the government.

> "What counts is whether the witness may be shading his testimony in an effort to please the prosecution. 'A desire to cooperate may be formed beneath the conscious level, in a

---

[3] The majority suggests that saying anything more than it does in Division 2 would be obiter dicta. Majority Op. at 436. If by that the majority means that its holding in Division 2 is very narrow and applies only to the facts of this case, and that its broad language does not constitute binding precedent, then that is a good thing, for all the reasons discussed below. My concern is that the unrestricted language used by the majority will nevertheless be cited as controlling by prosecutors, trials courts, and perhaps even this Court, as the majority has cited *Hewitt*, with the ultimate result being that defendants' Sixth Amendment right of confrontation will be improperly limited or, conversely, that hard-won convictions on behalf of crime victims will be reversed by appellate courts that more thoroughly analyze the issue.

manner not apparent even to the witness, but such a subtle desire to assist the state nevertheless may cloud perception.' [Cit.] [Cit.]"

*Hines v. State*, 249 Ga. 257, 260 (290 SE2d 911) (1982) (quoting *Greene v. Wainwright*, 634 F2d 272, 276 (5th Cir. 1981)). Accordingly, "[d]efense counsel is entitled to a reasonable cross-examination on the relevant issue of whether [a] witness entertained any belief of personal benefit from testifying favorably for the prosecution." *Vogleson*, 275 Ga. at 639.

We have also repeatedly held, however, that trial courts:

"retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."

*Vogleson*, 275 Ga. at 639 (quoting *Delaware v. Van Arsdall*, 475 U. S. 673, 679 (106 SC 1431, 89 LE2d 674) (1986)).

In seeking to reconcile the broad right to cross-examine cooperating witnesses and the trial court's broad discretion to regulate cross-examination, we have considered the extent of cross-examination allowed on other subjects and have also focused on whether the defendant was seeking to elicit "objective evidence" of the disparity between the sentence the witness will get as a result of his cooperation and the sentence he faced had he not cooperated, as opposed to the witness's mere hope for or speculation about the possibility of a lower sentence. See, e.g., *Vogleson*, 275 Ga. at 638 (objective evidence allows the jury to "determine whether the witness is biased to a degree that affects credibility and is an appropriate subject of inquiry"); *Howard v. State*, 286 Ga. 222, 225 (2) (686 SE2d 764) (2009) (question is whether the witness "obtained a concrete benefit for her testimony by which an objective comparison could be made to her potential sentences"); *Hodo v. State*, 272 Ga. 272, 273 (528 SE2d 250) (2000) (cross-examination regarding possible sentence if witness were ever charged for criminal conduct admitted in his testimony properly excluded as "conjecture").

Our cases have mostly involved such disparities in the *maximum* sentences the witness faced, where the analysis is usually straight-forward: compare the total maximum statutory sentence for the charge(s) the witness originally faced with the total maximum sentence for the charge(s) the witness faces after his agreement with the State. See, e.g., *Vogleson*, 275 Ga. at 637 (witness's guilty plea

reduced his maximum sentence exposure from 25 years to 10 years).

The same reasoning applies, however, to a concrete disparity between the witness's *minimum* sentences resulting from the charging decisions made by the district attorney in exchange for the witness's cooperation and testimony for the State. The question then is not a change in the *last* date that the witness would get out of prison, based upon the maximum sentence the trial court did or could have imposed on the relevant charges, but rather a change in the *first* date when the witness would be eligible to leave prison, based upon parole eligibility pursuant to the relevant charges. The analysis of such disparities may be more complicated, both because determining parole eligibility often requires looking beyond the terms of the charged offenses to consider the statutes, rules, and practices relating to parole, see, e.g., OCGA §§ 17-10-6.1, 17-10-7, 42-9-39, 42-9-40, and because the Board of Pardons and Paroles is independent of the district attorneys and generally has broad discretion to grant or deny parole, as is correctly noted in *Hewitt*, 277 Ga. 327, and in the majority opinion. See also *Daker v. Ray*, 275 Ga. 205, 206 (563 SE2d 429) (2002) (parole guidelines established and used by the Parole Board "simply establish an initial date of eligibility for parole, and the ultimate grant or denial of parole to a prisoner who is eligible for parole remains a discretionary matter for the Board").

But that does not mean that an objective and significant disparity in parole eligibility can *never* be presented. In some cases, particularly those involving statutory mandatory minimum sentences for certain offenses and recidivists, the Parole Board's discretion is limited by statute or by the rules it has adopted. See *Ray v. Barber*, 273 Ga. 856, 857 (548 SE2d 283) (2001) (affirming mandamus order where the Parole Board failed to follow its statutory duties and its rules in determining a tentative parole date). And there is no doubt that, in some cases, the opportunity for earlier release from prison, even if not guaranteed, is an important consideration for a witness facing time behind bars and therefore is an appropriate subject for cross-examination.

The most obvious example would be if the witness had originally faced a life sentence without possibility of parole but, after pleading guilty, faces life with the possibility of parole. While there still can be no certainty that the Parole Board will ever actually parole the witness, the witness's opportunity to leave prison alive, rather than in a casket, is unquestionably a real benefit that could influence the witness's testimony and that the defendant is therefore entitled to make known to the jury. Where the witness's parole eligibility is reduced through the interaction of the district attorney's charging decisions and the laws governing parole, there may be a provable disparity that, if it is significant and was understood by the witness,

is a legitimate subject for cross-examination. Likewise, in cases where the district attorney agrees to make a recommendation to the Parole Board in exchange for the witness's cooperation, that benefit is fair game for cross-examination.[4]

This does not mean that parole eligibility will regularly be a topic for cross-examination. In many cases, the time served before parole eligibility will not be affected by the State's dismissal or non-prosecution of some portion of the charges the witness faced. In other cases, evidence regarding the change in parole eligibility would add little to evidence regarding the change in the maximum sentence the witness faced, because the parole eligibility is simply proportional to the total sentence, and thus it could be limited or excluded in the trial court's discretion. In still other cases, the defendant would need to offer or proffer concrete evidence of the operation of the relevant parole statutes, regulations, or practices to show that an objective disparity in eligibility exists. And in every case, the witness would need to understand the parole disparity and its connection to the district attorney's charging decisions for the issue to be open to cross-examination, as witnesses cannot be influenced by matters about which they are unaware.

It cannot be said, however, as the majority opinion does in Division 2, that simply "because authority to grant parole rests with [the] Board of Pardons and Paroles and not the district attorney's office, cross-examination [about] parole is irrelevant on question of witness's potential bias in testifying favorably for the [district attorney]." There will be cases where a significant difference in parole eligibility can be objectively shown under existing law and practice, notwithstanding the Parole Board's independence and discretion. And if prosecutors and trial courts follow the majority's summary approach, there will be cases where they commit reversible error — whether that error is reversed by this Court, by limiting or overruling this case and *Hewitt*, or by the United States Supreme Court, in accordance with decisions such as *Davis v. Alaska*.

I nevertheless believe that the trial court in this case did not abuse its discretion in excluding cross-examination regarding Worthy's parole eligibility, although to reach that conclusion, I believe more than summary analysis is required. The record indicates that Worthy was originally charged with offenses carrying multiple life

---

[4] The fact that the Parole Board is an independent agency and might not follow the recommendation does not make the recommendation irrelevant, any more than the fact that even-more-independent trial judges may not follow a district attorney's recommendation as to how a cooperating defendant should be sentenced. The recommendation still has value to the cooperating defendant – or there would be no point in its being offered and made by the district attorney.

sentences plus many more years, all with the possibility of parole; after his plea to a subset of the charges, he faced only one life sentence, still with the possibility of parole. At trial, appellant's counsel suggested that under OCGA § 17-10-6.1, Worthy was originally not parole-eligible, but the transcript does not indicate that Worthy was a recidivist and absent that, he was parole-eligible under that statute.

Section 17-10-6.1 (c) (1) cross-references OCGA § 42-9-39, which provides that if Worthy had received *consecutive* life sentences including one for murder, he would have had to serve consecutive 30-year sentences for each such sentence, up to a maximum of 60 years, before being eligible for parole. So in theory, if Worthy had been convicted of more of his original charges and if the trial court had then sentenced him to *consecutive* life sentences, his parole eligibility would have come after 60 years in prison, rather than after 30 years (see OCGA § 17-10-6.1 (c) (1)) as a result of his plea. That would mean the difference between Worthy, who was 21 years old at the time of trial, possibly getting out of prison in middle-age or only having that chance as an octogenarian. That is a difference I believe would be significant to most young defendants and one that could affect how a jury evaluated such a witness's testimony for the State (particularly if the testimony about Worthy's maximum sentence left the impression that, despite the dismissal of charges pursuant to his plea bargain, he would still serve a "life sentence"). However, in the discussion at trial, defense counsel never mentioned OCGA § 42-9-39, and in the absence of such argument or more evidence on this point, I believe it too speculative to assume that the trial court would have given Worthy consecutive, rather than concurrent, life sentences had he not pleaded guilty. In this respect, I note that the trial court sentenced appellant, who was convicted after trial, to life for his felony murder conviction and to three *concurrent* life sentences on his armed robbery convictions.

During the argument on this issue at trial, the State noted that the defense had not offered any other evidence of a difference in parole eligibility, from someone familiar with the corrections system, for example. Finally, while Worthy told defense counsel that he thought he would be eligible for parole at some point, there is no evidence that Worthy thought he would *not* have been parole-eligible as originally charged. Thus, while Worthy's *maximum* sentence was greatly reduced by his deal — and cross-examination was properly allowed on that issue — there was no solid evidence that his parole eligibility was substantially different or that he understood it to be different because of his plea bargain with the State. Under these circumstances, in my view, the trial court did not abuse its discretion is denying cross-examination on parole eligibility.

*Hewitt* and Division 2 of the majority opinion state without restriction that parole eligibility is "irrelevant" to a cooperating witness's potential bias in testifying favorably for the State and hold that all cross-examination on that subject may therefore be prohibited. I believe those statements sweep too far, and that prosecutors and trial courts should be wary of accepting that invitation, rather than analyzing the issue more carefully as discussed above. For these reasons, I concur only in the result of Division 2.

I am authorized to state that Justice Melton joins in this special concurrence.

## DECIDED FEBRUARY 1, 2010.

*Peter D. Johnson*, for appellant.

*Richard A. Mallard, District Attorney, Thurbert E. Baker, Attorney General, Benjamin H. Pierman, Assistant Attorney General*, for appellee.