## A10A2071. WILLIAMSON v. THE STATE.
### (708 SE2d 57)

ADAMS, Judge.

Abdullah Williamson appeals the denial of his motion for new trial after a jury convicted him of two counts of armed robbery, three counts of aggravated assault with a deadly weapon, three counts of possession of a firearm during the commission of a felony, and possession of a firearm by a convicted felon.[1] For the reasons set forth below, we affirm.

Viewed in the light most favorable to the verdict, the evidence at trial showed that on or about September 7, 2006, Ardis Toney, Michael Buchanan, and Jovan Priest, all members of a rap group known as "Three Kings," were in Atlanta to promote their CD. They were driving a black Cadillac and were planning to purchase ten to thirteen pounds of marijuana. The three met a "middleman" named "Tay," at a gas station. Tay arrived at the station driving a gray Ford Focus. Buchanan got into the Focus with Tay and they drove away, followed by Toney and Priest in the Cadillac. Two men in a red Ford Mustang pulled up beside the Cadillac. Toney, who was driving the Cadillac, believed that these were the men with the marijuana, so he allowed the Mustang to get in front of him and he continued to follow. The Focus turned into a driveway and the Mustang pulled in next; Toney pulled the Cadillac in behind the Mustang.

When the cars stopped, the driver of the Mustang got out of the car and walked right in front of the Cadillac toward the Focus with a bag of marijuana, presumably to show Buchanan. The driver then walked back in front of the Cadillac to return to the Mustang. Toney could not see the driver well until the driver got out of the Mustang and walked in front of the Cadillac. He explained that this meeting took place around 6:00 or 7:00 p.m., and it was still light outside. He said that the driver of the Mustang was wearing green and also wore sunglasses and a hat over his "low cut" hairstyle. The other man had dreadlocks and wore a white shirt and an Atlanta Braves hat. Toney identified Williamson at trial as the man without the dreadlocks and as the driver of the Mustang.

---

[1] Williamson was also indicted on a charge of murder and two charges of felony murder, but the verdict form contains a handwritten note indicating that the jury was unable to reach a verdict on those charges.

Buchanan then got out of the Focus and into the passenger side of the Mustang beside Williamson, who had returned to the car. Toney testified that neither Buchanan, Priest, nor he had a gun that day. Buchanan had $3,000 to $5,000 in his pocket, and they had $10,000 in a red box inside the Cadillac. Buchanan and the driver spoke for a few minutes, and then Buchanan got out of the car and walked toward the Cadillac. The man with the dreadlocks walked to the car with him, and Buchanan showed the man the $10,000 in the box. Buchanan returned to the Mustang and within 30 seconds, Toney heard a gunshot, which he said "had to be inside the car." Toney was sure that Tay had not been the one to fire the shot. Buchanan jumped out of the car and ran past the Cadillac where he collapsed on the ground. The driver then got out of the Mustang, walked to the Cadillac and pointed a gun at Toney and Priest. Buchanan yelled at Toney and Priest to give him the $10,000. Toney passed the money to Priest who threw it out the window toward the man with the white shirt and the dreadlocks. Williamson and the man with the dreadlocks jumped in the Mustang and drove off. Toney and Priest then put Buchanan in the car and started to follow Tay to the hospital, but they were intercepted by the police, who summoned an ambulance. Buchanan later died from his injuries.

Toney and Priest subsequently picked Octavian Dwight out of a lineup and identified him as Tay, the middleman who set up the drug deal. But seven days after this incident, police showed Toney and Priest a six-photograph lineup that included a photograph of Williamson. Neither Toney nor Priest was able to pick Williamson out of the lineup. Toney testified that he looked at the driver again briefly for about five seconds when he was pointing the gun at him. When Williamson's counsel asked Toney whether he could tell the jury beyond a reasonable doubt that Williamson was the man driving the Mustang that day, Toney replied, "He didn't have hair like that. He had a hat on, and had some shades on, but he resembles him very much so." He went on to say, however, that he could "assume" that it was Williamson because he was sitting at the defense table. But when Williamson's attorney again pressed him on his identification, Toney stated, "Totally honest, he looks like him, yeah."

Jovan Priest also testified that the Mustang's driver got out of the car to show Buchanan some marijuana, but he did not get a good look at him. Buchanan was alone in the Mustang with the driver at the time the shot was fired. He saw Buchanan run from the car, and both the driver and the Mustang passenger, who had dreadlocks, pointed guns at Toney and Priest. Priest threw the red box with the money out of the car toward the man with the dreadlocks. He said that he made no eye contact with the men.

Fernando Cannon, Williamson's co-defendant in the case, pled

guilty the day before Williamson's trial to charges of armed robbery and possession of a firearm during the commission of a felony. He was sentenced to 20 years to serve. When the State called Cannon as a witness at Williamson's trial, he said that he had been "misguided" by his counsel and asked for a new attorney. Cannon said that he did not want to testify, and the trial court allowed the State to treat him as a hostile witness. The court also allowed Cannon five minutes to confer with counsel.

After testimony resumed, Cannon stated that he was involved in a drug deal with Octavian "Tay" Dwight on September 7, 2006 involving the sale of 13 pounds of marijuana. He admitted that he had said in court the day before that Williamson, Buchanan, Toney and Priest were also involved in the transaction. Cannon admitted saying that he was in the Mustang with Williamson that day; Tay was in a Ford Focus and the others were in a Cadillac. Cannon said that he was not in the Mustang at the time Buchanan was shot but rather got out of the car and went to the Ford Focus. He heard some arguing at the time Buchanan was in the Mustang. Although Cannon was extremely reluctant to respond to any questions involving Williamson, he confirmed that he had said at his plea hearing that only Williamson and Buchanan were in the Mustang at the time of the shooting, although he did not see the shooting occur. At the time of the shooting, Cannon was in the Focus with Tay, and Priest and Toney were in the Cadillac. Although Cannon apparently stated at the plea hearing that the shot came from inside the car, he testified at trial that he did not know where the shot came from.

After the shot rang out, Tay got out of the car and ran down the street. Cannon grabbed a gun from inside the Focus and got out of the car. He walked over to the Cadillac and pointed the gun at Priest and Toney. He acknowledged telling prosecutors the day before that Priest and Toney had thrown a red box out of the window of the Cadillac, but he refused to answer the prosecutor's questions as to whether he got in the car with Williamson and drove away. Nevertheless, he admitted later that after the shooting he was dropped off "at the top of the street" where he got out of the Mustang. The driver of the Mustang drove off. Cannon said that he never drove the Mustang. At that point, Cannon ran home, out of breath, where he told his wife that he had heard a shot and he ran. He recalled her asking whether Williamson had shot somebody and he told her that he did not know.

On cross-examination, Cannon testified that he rode to the gas station that day with Tay in the Ford Focus where he saw the Cadillac with the men he later came to identify as Tony, Priest and Buchanan. Cannon went inside the gas station, and as he came out, he saw Buchanan get in the Ford Focus and one of the Cadillac

passengers move to the Cadillac's driver's seat. The prosecutor then asked Cannon whether it was true that Williamson "was not at *that* scene" (emphasis supplied), and Cannon answered, "Correct." But Cannon refused to respond when the defense attorney asked him to state that Williamson was not involved in the drug deal. And although Cannon testified that he did not see Williamson shoot anyone and did not even see him with a gun, he refused to respond when counsel asked him to state that Williamson was not at the scene of the shooting.

On re-direct, Cannon stated that after he had entered his guilty plea the day before, he had been attacked and almost stabbed that night in the Fulton County Jail. Cannon stated that he was quiet in response to any questions about Williamson because he did not want to testify against him. On re-cross, he clarified that the men who jumped him called him a "snitch on [Williamson]."

Bernithia Young, Cannon's wife, also reluctantly testified at Williamson's trial. Young stated that a man she believed to be Williamson called her the night before the trial and she got the impression from that conversation that if her husband testified against Williamson something would happen to her husband. Nevertheless, Young testified that Cannon came home on the day of the shooting breathing hard and panicking. She asked him what was wrong. He said that he thought someone had been shot. Cannon said that he had been in a car with Williamson and he thought Williamson had shot the person.

Larry Humphrey testified that he lived near the crime scene, and on the evening in question, he heard a gunshot as he was outside his house. When he ran around to the front to see what had happened, he observed two men standing up; one was hopping around. The other man, who had dreadlocks was saying, "Where the money, where the money?" At that point Humphrey went back inside to get a gun. When he re-emerged, he saw the man in dreadlocks get into the passenger side of the Mustang and the car drove off. He saw another man running away up the street, who later came back. He had heard a lady across the street holler and he believed that scared the men away. Humphrey and his partner then approached the Cadillac and asked if they needed paramedics, but the men in the car said that they would drive the injured man to the hospital.

Shirley Ashanti, another nearby resident, testified that she was inside her house on the phone when she heard cars screeching and loud arguing. She then heard a gunshot and looked out her window. Ashanti saw three cars, including a red sports car. She saw a person on the ground, bleeding who was trying to get up and run, and she saw a man with a cap holding a gun coming from the driver's side of

the red car. She said it looked like smoke was coming out of the gun and that he was coming around the car to shoot the person again. Before she knew it, she was outside yelling at him not to shoot anymore.

Detective D. R. Dumas of the Atlanta Police Department testified that he processed the crime scene in this case. He testified that a search of the scene revealed a small red box and a substance that looked like compressed marijuana but that Dumas believed it to be counterfeit because it did not have the strong pungent odor usually associated with the drug. Police also found a cigarette butt, an unfired cartridge and blood stains.

1. Williamson raises the general grounds, contending the State failed to present sufficient evidence to corroborate Cannon's testimony. We disagree.

Although Williamson is correct that the uncorroborated testimony of an accomplice is not sufficient in and of itself to support a felony conviction,

> it is not required that this corroboration shall of itself be sufficient to warrant a verdict, or that the testimony of the accomplice be corroborated in every material particular. Slight evidence from an extraneous source identifying the accused as a participator in the criminal act will be sufficient corroboration of the accomplice to support a verdict. The sufficiency of the corroboration of the testimony of the accomplice to produce conviction of the defendant's guilt is peculiarly a matter for the jury to determine. If the verdict is founded on slight evidence of corroboration connecting the defendant with the crime, it can not be said, as a matter of law, that the verdict is contrary to the evidence.

(Citation omitted.) *Wilson v. State*, 306 Ga. App. 827, 828 (1) (703 SE2d 400) (2010). "If there is *any* evidence of corroboration, this court will not go behind the jury verdict and pass on its probative value." (Citation and punctuation omitted; emphasis in original.) Id. at 829 (1).

Although Cannon did not witness the shooting, his testimony placed Williamson inside the red Mustang on the day in question and he confirmed his earlier statement that Buchanan and Williamson were alone in the car at the time of the shooting. Toney also identified Williamson as the man driving the Mustang that day and sitting with Buchanan inside the car at the time of the shooting. Toney had the opportunity to observe the driver when he walked back and forth in front of the Cadillac to show Buchanan the marijuana. After the shooting, that man got out of the car, walked

over to the Cadillac, and pointed a gun at Toney and Priest. Toney glanced up again for about five seconds at that point. Although Williamson's attorney attempted to cast doubt on this identification on cross-examination, Toney maintained that Williamson looked "very much" like the driver. It was for the jury, and not for this Court, to determine the proper weight to give Toney's identification. "The determination of a witness's credibility, including the accuracy of eyewitness identification, is within the exclusive province of the jury." (Citation and footnote omitted.) *Justice v. State*, 263 Ga. App. 858, 859 (589 SE2d 624) (2003). Thus, the jury could have determined that Toney's testimony provided corroboration for Cannon's identification of Williamson. Further corroboration for both men's testimony was provided by the neighbors' description of the robbery and shooting, by Young's description of Cannon's demeanor and behavior that day, and by physical evidence found at the scene. See *Benbow v. State*, 288 Ga. 192, 194 (702 SE2d 180) (2010); *Howard v. State*, 286 Ga. 222, 228 (4) (686 SE2d 764) (2009); *Wilson*, 306 Ga. App. at 829-830 (1). Accordingly, the evidence was sufficient to support Williamson's conviction beyond a reasonable doubt, and the trial court properly denied Williamson's motions for directed verdict and new trial. *Hardaway v. State*, 188 Ga. App. 310 (1) (372 SE2d 845) (1988).

2. Williamson also argues that the trial court erred in denying his request to give the following charge:

> Simply because an accomplice's testimony is corroborated in most details, it does not follow that his (the accomplice's) testimony alone as to the identity and participation of the accused is sufficient to justify conviction.

"The only requirement regarding jury charges is that the charges, as given, were correct statements of the law and, as a whole, would not mislead a jury of ordinary intelligence." (Citation and punctuation omitted.) *Corbin v. State*, 305 Ga. App. 768, 771 (2) (700 SE2d 868) (2010).

> It is a fundamental rule in Georgia that jury instructions must be read and considered as a whole in determining whether the charge contained error. The failure to give requested instructions in the exact language requested, where the charge given substantially covers the same principle, is not grounds for reversal.

(Citation and punctuation omitted.) *Singleton v. State*, 297 Ga. App. 452, 454 (2) (677 SE2d 348) (2009).

We conclude from a review of the transcript that the trial court fully instructed the jury on corroboration of accomplice testimony. The trial court gave the pattern jury charge, stating in pertinent part that the corroborating evidence

> must be more than that a crime was actually committed by someone. It must be sufficient to connect the accused with the criminal act. . . . Slight evidence from another source that connects the accused with the commission of the alleged crime and tends to show participation in it may be sufficient supporting evidence of the testimony of an accomplice in order to convict. In order to convict that evidence, when considered with all the other evidence in the case, must be sufficient to satisfy you beyond a reasonable doubt that the accused is guilty.

In addition, the trial court charged the jury on the State's burden to prove beyond a reasonable doubt the identity of Williamson as the person who committed the crimes in the indictment, witness credibility, and factors the jury should consider in assessing the reliability of identification evidence. Thus the jury charge when considered as a whole fully covered the law on the required corroboration of accomplice identification testimony, and no reversible error occurred in failing to give Williamson's requested jury charge.

3. Williamson's counsel also objected when the prosecutor addressed the issue of corroboration in his closing argument. He asserts that the argument could have led the jury to misapply the law.

The prosecutor argued that although the State needed only slight evidence to corroborate Cannon's testimony, it had "way more than slight evidence." He explained:

> If Mr. Cannon gets up, and think about what corroboration is, okay, we throw these words around, and we use them every day, but think about what corroboration is. If Mr. Cannon got up and said, they threw the money out in a red box, and we didn't have a red box, well, guess what, we wouldn't have anything to corroborate what he said. But guess what, we've got this red box. I have been waving it around.

Williamson's attorney objected, stating that if the prosecutor was going to argue the law of corroboration, "he has got to argue it . . . correctly." The trial court overruled the objection and instructed the jury, "Well, let me say both lawyers are arguing the law, and the jury

will take the law from the Judge. The lawyers may talk about it, and I am going to overrule the objection."

Putting aside Williamson's failure to specify a basis for his objection other than to imply that the prosecutor had somehow incorrectly stated the law,[2] we find no error. Even if we were to assume that the objection properly preserved the argument raised on appeal, the prosecutor's argument did not misconstrue the law. The prosecutor correctly stated that evidence that a red box was found at the scene would corroborate Cannon's statement that the money had been thrown out in a red box. Nothing in the prosecutor's argument implied, for example, that the evidence of the red box alone would be sufficient to corroborate Cannon's identification of Williamson. Although Williamson points to other instances where the prosecutor argued corroboration, he raised no objection to any other portion of the argument. See *Anderson v. State*, 286 Ga. 57, 58 (4) (685 SE2d 716) (2009) (failure to make contemporaneous objections to closing argument of prosecutor waived issue for appeal). Accordingly, Williamson's argument on this ground is without merit.

*Judgment affirmed. Ellington, C. J., and Andrews, J., concur.*

DECIDED MARCH 16, 2011.

*Franklin, Hubbard & Clayton, Curtis L. Hubbard, Jr.,* for appellant.

*Paul L. Howard, Jr., District Attorney, Marc A. Mallon, Bettieanne C. Hart, Assistant District Attorneys,* for appellee.

---

[2] See *Franklin v. State*, 230 Ga. 291, 292 (1) (196 SE2d 845) (1973) (objection that question was "highly prejudicial" too general).

