303 Ga. 134
FINAL COPY

S17A1911. LUCAS v. THE STATE.

BLACKWELL, Justice.

Dequontist Lucas was tried by a Cobb County jury and convicted of murder, armed robbery, and other crimes in connection with the fatal shooting of Samuel Steward and the wounding of Demarco Tyler.[1] Lucas appeals, claiming that the trial court erred when it limited his cross-examination of two witnesses for the prosecution. We find no merit in these claims and affirm.

---

[1] The crimes were committed on July 22, 2008. On June 7, 2012, a Cobb County grand jury indicted Lucas, charging him with malice murder, two counts of felony murder, armed robbery, two counts of aggravated assault, four counts of unlawful use of a firearm by a convicted felon, and possession of a firearm by a convicted felon. His trial began on October 14, 2013, and four days later, the jury returned its verdict, finding him guilty on all counts. The trial court sentenced Lucas to imprisonment for life for malice murder, a consecutive term of imprisonment for life for armed robbery, and consecutive terms of imprisonment for 15 years on two of the firearm counts. The other counts merged or were vacated by operation of law. See Malcolm v. State, 263 Ga. 369, 373 (5) (434 SE2d 479) (1993). Lucas filed a motion for new trial on October 23, 2013, and he amended his motion on July 14, 2014. The trial court held a hearing and denied the motion on October 9, 2014. Lucas filed a notice of appeal to the Court of Appeals on October 28, 2014. The Court of Appeals transferred the case to this Court on June 5, 2017, where it was docketed to the August 2017 term and submitted for a decision on the briefs.

1. Viewed in the light most favorable to the verdict, the evidence at trial shows that, on the evening of July 22, 2008, Lucas and an unidentified male companion robbed Steward and Tyler at gunpoint and then shot the two victims. Steward died from a gunshot wound to the head, but Tyler escaped with a relatively minor wound — the bullet only grazed his head. The State's main witness was Quatney Sapee, who was Lucas's girlfriend at the time of the incident. Sapee testified that on the day in question, she drove Lucas and two other men — Kirkland Smith and a man known to Sapee only as "Dreads"[2] — in a Ford Explorer to Marietta, where they apparently planned to visit a "liquor house" "to drink and get high." Lucas and Dreads both were armed with handguns. As they neared the liquor house, Lucas asked to be dropped off, and he and Dreads exited the vehicle.

Sapee and Smith continued to the liquor house, waited in the liquor house driveway for a few minutes, and then returned to the location at which they had dropped off Lucas and Dreads. There, Sapee saw Lucas and Dreads holding two young men at gunpoint. Smith yelled for Lucas and Dreads to stop what they

_____

[2] "Dreads" had dreadlocks, and according to Sapee, he was either Lucas's friend or relative.

were doing. Sapee saw Steward shake his head at Lucas, "as if he was saying no or stop." At that point, "the guns went off" and Steward collapsed. Tyler ran, but another shot went off, and he fell also. Sapee testified that she saw Lucas fire the shot that hit Steward.

After the shooting, Lucas and Dreads hopped back into the car. Smith announced that he was on parole and did not want to go back to jail, but Lucas told him to shut up and ordered Sapee to drive. Lucas also told Smith and Sapee that, if they told anyone about the shooting, he would kill them. As they were driving, Lucas threw a cellphone that he had taken from Steward out the window. He told Sapee that he "couldn't believe [Steward] only had $3" and that Steward would not have been shot if he had more money. After they dropped off Dreads and Smith at their homes, Lucas again told Sapee that if she informed on him, he would kill her. He repeated that threat to Sapee a "hundred" times over the course of their relationship.

Sapee kept quiet about the shooting for close to three years, until an investigator from DeKalb County interviewed her about another crime committed by Lucas. During that interview, Sapee volunteered information about the murder of Steward, but her statements to the investigator differed

3

somewhat from her trial testimony. Specifically, Sapee told the investigator that, on the day in question, she, Lucas, Smith, and Dreads were riding around looking for someone to rob — an activity she termed "free-picking." The four drove to Marietta, where they came across Steward and Tyler. Lucas told Sapee to pull over, and when Lucas and Dreads got out, Smith told her to drive on because he did not want to be involved. Sapee then drove around the block, and coming back around, saw Lucas and Dreads accosting the two young men. She heard one of the young men say, "I don't have anything," and then saw Lucas shoot him in the head.

Another eyewitness, A.L., testified that during the relevant time period, he lived within sight of the scene of the shooting. On the night in question, as A.L. and his wife were driving home, they saw Steward and Tyler standing on the street corner. When A.L. and his wife parked in their driveway, A.L. observed Lucas and another man approach Steward and Tyler. A.L. saw Lucas hit Steward in the back of the head, pull out a gun, and shoot him. At that point, a Ford Explorer drove by and picked up Lucas and his companion. At trial, A.L. positively identified Lucas as the man who shot Steward. A.L.'s wife also testified — she saw one of the assailants knock Steward unconscious and then

4

shoot him while he was lying on the ground — but she could not identify the shooter in court.

Other evidence presented at trial includes the following. Smith testified for the prosecution, but in contrast to Sapee's testimony, he denied riding in the vehicle with Sapee or being present at all during the incident. Rather, Smith asserted that Lucas later confessed to him that Lucas and Dreads committed the robbery and shooting. Tyler testified that the assailants took his phone and identification card during the course of the robbery. Furthermore, the parties stipulated that Lucas was a convicted felon at the time of the incident, having been previously convicted of a felony involving the use of a firearm.

Lucas does not dispute that the evidence is sufficient to sustain his convictions. But consistent with our customary practice in murder cases, we independently have reviewed the record to assess the legal sufficiency of the evidence. We conclude that the evidence presented at trial was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Lucas was guilty of the crimes of which he was convicted. See Jackson v. Virginia, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

2. Lucas claims that the trial court erred when it prohibited him from cross-examining A.L. about his immigration status. At the time of trial, A.L. was not lawfully present in the United States. As a result, Lucas argues, A.L. might have been inclined to shade his testimony in favor of the prosecution to avoid deportation. By barring any cross-examination about A.L.'s immigration status, Lucas contends, the trial court violated his right to establish the bias of an important witness for the prosecution. We disagree.

Like most questions about the admissibility of evidence, the scope of cross-examination is committed in the first instance to the sound discretion of the trial court, and we review a limitation of cross-examination only for an abuse of that discretion. See Nicely v. State, 291 Ga. 788, 796 (4) (733 SE2d 715) (2012). That discretion is circumscribed, of course, by our Evidence Code, which provides that the accused is entitled to a "thorough and sifting cross-examination" of witnesses for the prosecution. OCGA § 24-6-611 (b). It also is circumscribed by the Confrontation Clauses of the United States and Georgia constitutions,[3] which secure, among other things, the right of the accused to

---

[3] See U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."); Ga. Const. of 1983, Art. I, Sec. 1, Par. XIV ("Every person charged with an offense against the laws of this state . . . shall

cross-examine the witnesses against him. See <u>Davis v. Alaska</u>, 415 U. S. 308, 315 (2) (94 SCt 1105, 39 LE2d 347) (1974); <u>Miller v. State</u>, 266 Ga. 850, 856 n.1 (472 SE2d 74) (1996). And it is settled that this right of cross-examination includes a right to inquire into the partiality and bias of witnesses. See <u>Hodo v. State</u>, 272 Ga. 272, 274–275 (4) (528 SE2d 250) (2000). See also OCGA § 24-6-622 ("The state of a witness's feelings towards the parties and the witness's relationship to the parties may always be proved for the consideration of the jury."); <u>Davis</u>, 415 U. S. at 316-317 (2) ("[T]he exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." (Citation omitted)).[4]

The right to inquire into partiality and bias, however, is not without limits. See <u>Howard v. State</u>, 286 Ga. 222, 225 (2) (686 SE2d 764) (2009) ("[T]he right of cross-examination . . . is not an absolute right that mandates unlimited

be confronted with the witnesses testifying against such person.").

[4] Both OCGA §§ 24-9-611 (b) and 24-6-622 were carried over from the old Evidence Code (former OCGA §§ 24-9-64 and 24-9-68, respectively). See <u>State v. Frost</u>, 297 Ga. 296, 299 (773 SE2d 700) (2015) (when courts consider the meaning of provisions carried over from the old Evidence Code, "they may rely on Georgia decisions under the old Code").

questioning by the defense . . . ." (Citation and punctuation omitted)). As we have explained before, the accused is "entitled to a *reasonable* cross-examination on the relevant issue of whether a witness entertained any belief of personal benefit from testifying favorably for the prosecution." Hampton v. State, 289 Ga. 621, 626 (5) (713 SE2d 851) (2011) (citation and punctuation omitted; emphasis supplied). "[T]rial courts retain wide latitude to impose reasonable limits on cross-examination based on concerns about, among other things, interrogation that is only marginally relevant." Nicely, 291 Ga. at 796 (4) (citation and punctuation omitted). See also Kolokouris v. State, 271 Ga. 597, 600 (4) (523 SE2d 311) (1999) ("Generally speaking, the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way and to whatever extent, the defense might wish." (Citation omitted)). On the record in this case, we cannot say that the trial court abused its discretion when it disallowed cross-examination of A.L. about his immigration status.

Before the trial court disallowed that line of cross-examination, it permitted Lucas to examine A.L. outside the presence of the jury. In the course of that examination, A.L. conceded that he was generally concerned about the

8

prospect of deportation. But without more, such a generalized concern does not provide much reason to think that A.L. had cause to shade his testimony in favor of the prosecution. In the first place, the State of Georgia — the prosecution in this case — has no power to deport a person unlawfully present in the United States. Deportation is a matter reserved to the United States. Although we do not doubt that some aliens may not appreciate the distinction between our federal and state governments, nothing in the record suggests that A.L. misapprehended that the prosecuting attorneys or investigating law enforcement officers with whom he dealt had any power to have him deported or to otherwise affect his immigration status. Indeed, about that subject, A.L. said: "I don't know if this has anything to do with immigration or not."

A.L. was asked whether he was concerned that, if he did not cooperate with the prosecution, "they might call immigration," and he said that he was not. There is nothing to suggest that anyone associated with the prosecution threatened or intimated anything to A.L. about deportation, that anyone promised to help A.L. with his immigration status, or that A.L. had a subjective belief that cooperating with the prosecution would somehow benefit him with respect to his status. When A.L. was asked whether greater cooperation with law

9

enforcement made it less likely that they would contact federal immigration authorities about him, he said: "Well, I don't know that."

The notion that A.L. was influenced in any way with respect to his testimony by his immigration status is simply speculative, and evidence of his immigration status — if relevant at all to his bias and partiality — had very little probative value. See Olds v. State, 299 Ga. 65, 75 (2) (786 SE2d 633) (2016) ("[T]he greater the tendency to make the existence of a fact more or less probable, the greater the probative value. And the extent to which evidence tends to make the existence of a fact more or less probable depends significantly on the quality of the evidence and the strength of its logical connection to the fact for which it is offered." (Citation omitted)). Such evidence, on the other hand, could have impugned his character, and it certainly carried the potential to prejudice jurors against him. See Sandoval v. State, 264 Ga. 199, 200 (2) (442 SE2d 746) (1994). See also OCGA § 24-4-403 ("Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ."). Moreover, the trial court did not prohibit Lucas from cross-examining A.L. generally about bias or partiality towards the prosecution. Lucas was not prevented from asking, for example, whether A.L. hoped to

10

receive any benefit as a result of his testimony. Only his immigration status was off-limits. See Junior v. State, 282 Ga. 689, 691 (2) n.4 (653 SE2d 481) (2007) (even assuming that victims' immigration status created a bias analogous to a deal with the State, the defendant was only prohibited from asking about their immigration status; the prohibition "did not encompass any and all questions concerning whether the victims received any benefit in exchange for their testimony"). In these circumstances, the trial court was within its considerable discretion to disallow cross-examination of A.L. about his immigration status. See Nicely, 291 Ga. at 796 (4) (trial court did not abuse its discretion in prohibiting defendant from questioning the State's witness about a certain collusive "understanding" among Georgia medical examiners, where the witness testified, outside the jury's presence, that his testimony would not be influenced by any such understanding); Lemons v. State, 270 Ga. App. 743, 749 (4) (608 SE2d 15) (2004) (defendant was not entitled to cross-examine victim witnesses about their illegal immigration status where the record showed that the State "made no promises or offers to assist the victims with their immigration status and that the victims had not asked for any assistance in exchange for their testimony").

11

3. Lucas contends that the trial court also erred when it limited his cross-examination of Sapee. Prior to trial, the State made an oral motion in limine to exclude any mention of a potential sentence that Lucas would face if convicted. Lucas responded, among other things, that he wanted to explore the potential penalties that Sapee would have faced if she had been charged as a party to Lucas's crimes. The trial court granted the State's motion in part and denied it in part, allowing Lucas "to probe generally into any potential biases, prejudices, or ulterior motives" of a witness, but prohibiting him from "any cross-examination that may call for legal conclusions or addresses sentences specifically." This ruling was not an abuse of discretion.

We previously have held that, where a State's witness is testifying in exchange for a reduction in prison time, the defendant must be allowed to question the witness "about the witness's belief concerning the amount of prison time he is avoiding by testifying against the defendant." State v. Vogleson, 275 Ga. 637, 640 (1) (571 SE2d 752) (2002). But where the State's witness had not been charged with any crime, the trial court may prohibit the defendant from "speculat[ing] about the punishment that could be imposed upon [the witness] should the State decide to prosecute him for the criminal conduct he had

12

admitted in his testimony." Id. (distinguishing <u>Hodo</u>, 272 Ga. at 274-75 (4)). See also <u>Smith v. State</u>, 300 Ga. 538, 542 (3) (796 SE2d 666) (2017) ("[W]here a witness has not obtained a concrete plea deal from the State in exchange for his testimony, the accused may not bring out the potential penalties faced by the witness." (Citation and punctuation omitted)).

Here, at the time of trial, Sapee had not been charged with any crimes in connection with Steward's death. Nor was there evidence that she had made any deal with the State to testify in exchange for not being charged. Any questions about potential sentencing would be mere speculation, irrelevant to Sapee's credibility or Lucas's guilt. See <u>Smith</u>, 300 Ga. at 542 (3). Moreover, as with A.L., the trial court did not prohibit Lucas from exploring Sapee's potential bias by asking her if she hoped to avoid being indicted in exchange for her testimony. As it happens, the State preemptively questioned Sapee about such potential bias, asking her whether she had been threatened with arrest in connection with the case, whether she had failed to cooperate at any point, and whether anyone from the prosecutor's office had made any threats or promises to her in exchange for her testimony. To each of these questions, Sapee answered in the negative, and Lucas had the opportunity to further test these

13

answers on cross-examination. Accordingly, the trial court did not abuse its discretion when it limited Lucas's cross-examination of Sapee. See Hodo, 272 Ga. at 274-275 (4) ("The mere fact that [defendant] was unable to ask [witness] to conjecture about possible punishment did not diminish [defendant's] attempt to show [witness's] motive for testifying on behalf of the State, and did not amount to an abuse of the trial court's discretion."); Cheley v. State, 299 Ga. 88, 94 (4) (786 SE2d 642) (2016) (trial court did not abuse its discretion in prohibiting defendant from cross-examining jailhouse informants about the charges and potential sentences they faced).

Judgment affirmed. All the Justices concur.

Decided February 19, 2018.

Murder. Cobb Superior Court. Before Judge Ingram.

Mitchell D. Durham, for appellant.

D. Victor Reynolds, District Attorney, Michael S. Carlson, Amelia G. Pray, Benjamin M. First, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Ashleigh D. Headrick, Assistant Attorney General, for appellee.