NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: June 21, 2023

S23A0338. JOHNSON v. THE STATE.

PINSON, Justice.

Reginald Demarcus Johnson was convicted of felony murder and first-degree cruelty to children in connection with the death of his six-month-old daughter, Jordan.[1] On appeal, Johnson contends

---

[1] The crimes occurred in April 2016. Johnson was indicted by a DeKalb County grand jury in May 2016 on one count each of malice murder, felony murder, and cruelty to children in the first degree. After a jury trial held in August 2016, Johnson was acquitted of the malice-murder charge but found guilty of felony murder and first-degree child cruelty. Johnson was sentenced to serve life in prison for felony murder; the child-cruelty count was merged into the felony murder count for sentencing purposes. Prior to his sentencing, Johnson filed a premature motion for new trial on October 3, 2016, which ripened upon the entry of the final disposition on October 5, 2016. See *Southall v. State*, 300 Ga. 462, 464-467 (1) (796 SE2d 261) (2017). Johnson amended his motion for new trial through new counsel in August and December of 2020 and January of 2021. The trial court held a hearing on the motion for new trial in September 2021. Johnson filed a premature notice of appeal on November 29, 2021, which he withdrew on January 4, 2022. The trial court denied the motion for new trial on August 15, 2022, and Johnson filed a timely notice of appeal on August 30, 2022. The appeal was docketed to the term of this Court beginning in December 2022 and was thereafter submitted for a decision on the briefs.

that (1) the evidence was insufficient to support his convictions; (2) the verdict was contrary to the law and evidence and strongly against the weight of the evidence; (3) the trial court erred by admitting certain photographs taken before and during the autopsy; (4) the trial court erred by limiting the defense's cross-examination of Jordan's mother; (5) the trial court erred by allowing certain testimony by the medical examiner; (6) the trial court erred by excluding testimony about the defense's unsuccessful effort to procure a witness; and (7) the trial court committed plain error by failing to give a jury instruction on accident.

Each of these claims fails. When viewed in the light most favorable to the verdicts, the evidence at trial showed that Jordan died from blunt force trauma to the head that was intentionally inflicted within the twelve-hour period when she was in Johnson's sole care and that the evidence was sufficient to sustain the convictions as a matter of constitutional due process. And the jury was authorized to find that the evidence, although circumstantial, excluded every reasonable hypothesis other than that of Johnson's

2

guilt, so the evidence was also sufficient as a matter of Georgia statutory law. The trial court's refusal to grant a new trial on the "general grounds" is not subject to this Court's review, so that claim fails. The autopsy photographs, used by the medical examiner to help explain his conclusions about Jordan's injuries, were probative as to both the timing and the manner of injury, and the trial court did not abuse its discretion in concluding that the danger of unfair prejudice from their admission did not substantially outweigh their probative value. And even if the single "pre-autopsy" photograph should not have been admitted, it is highly probable that this photograph—which was far less graphic than the properly admitted autopsy photographs—did not contribute to the verdicts. Finally, the trial court did not abuse its discretion in prohibiting the defense from cross-examining Jordan's mother on a topic not relevant to Johnson's guilt or innocence; did not plainly err in allowing certain testimony by the medical examiner on a subject which his experience qualified him to speak on; did not abuse its discretion in refusing to allow testimony about the defense's effort to procure a

3

witness, when it had failed to avail itself of the statutory material witness subpoena procedure; and did not plainly err in failing to give a jury instruction on accident because this theory was at odds with not only Johnson's primary defense but also the overwhelming weight of the evidence. We therefore affirm Johnson's convictions and sentence.

1. The evidence at trial showed as follows.[2]

(a) At 6:40 a.m. on April 4, 2016, emergency responders were dispatched to a DeKalb County home after Johnson made a 911 call to report that his six-month-old daughter, Jordan, was unresponsive. One of the paramedics who responded testified that she could tell Jordan had suffered a brain injury, based on her unequally dilated pupils and the swelling and bruising on her right temple. She said that Johnson at the time seemed a little nervous

---

[2] Our resolution of two of Johnson's claims requires an assessment of the harm of presumed or actual trial errors. To undertake that assessment, we must "review the record de novo, and we weigh the evidence as we would expect reasonable jurors to have done." *Moore v. State*, 315 Ga. 263, 264 (1) n.2 (882 SE2d 227) (2022) (citation and punctuation omitted). In light of that standard of review, we recount the evidence here through that lens rather than recounting it in the light most favorable to the jury's verdict.

but not distraught. She also said that Johnson told her that Jordan's twin brother sometimes "head-butted" her, but she did not believe Jordan's injuries could have happened that way.

Another of the emergency responders testified that Johnson's demeanor "wasn't like a frantic parent would be." That witness testified that Johnson told her that he woke up in the night and saw Jordan's twin "laying on top of her suffocating her." When she told Johnson his story was "not adding up" and that Jordan could not have sustained her injuries that way, Johnson suggested that "maybe it was when [she] rolled off the bed." He denied dropping her by accident or hitting her, then "got quiet" and suggested that "maybe the other child did it."

The pediatric emergency physician who treated Jordan at the hospital testified that Jordan's CT scan showed fractures on both sides of her skull and bleeding in the brain. Those injuries, he opined, could not have been caused by another six-month-old in the ways Johnson suggested and would have had to have resulted from "major trauma" such as a car accident without seatbelts, getting hit

5

or kicked with great force, or falling from a "great height." In addition, the effects of the head trauma would have been noticeable within minutes to an hour of the trauma, such that Jordan would not have engaged in normal movement or made normal noises.

A hospital social worker who spoke with Johnson testified that Jordan's injuries were "completely inconsistent" with Johnson's story and that, based on the severity of the injury and the absence of any obvious explanation for it, she suspected child abuse and determined that law enforcement needed to be contacted.

(b) Jordan's mother, Ciara Cole, testified about the chronology of events on April 3 and 4. At the time, she and the twins were living at her mother's home, and Johnson, who had lived with them at one time, was living with his aunt, Sallie White. On April 3, Cole and the twins were at her mother's home until about 2:30 p.m., when she left for a short time to pick Johnson up from work. When they returned, they were arguing. While she took a shower, Johnson took the twins, left the house, and walked to a nearby restaurant. She tracked them down and drove there, and they all left together to go

to Johnson's grandmother's house. Johnson's father, who was at the house, took Jordan in the house for about five minutes; at that time, Jordan seemed "normal." After a short time, Cole took Johnson and the twins to White's home, where they were to stay that night. She dropped them off, went back to her mother's home, and later went out with friends. Throughout the night and into the morning, Cole exchanged texts with Johnson, checking on the twins. Johnson never indicated there was anything unusual, until he called early on the morning of April 4 to tell her Jordan was unresponsive. Ultimately, on April 7, once the extent of Jordan's injuries was known, the decision was made to take her off life support.

Cole testified that she had suffered from depression after the twins were born. She also admitted that, after Jordan died, she began using cocaine and had been arrested for cocaine possession and theft by shoplifting, and that such charges were still pending at the time of trial. Cole said she had been offered no deal in exchange for her testimony here. In addition, Cole admitted that her other children "live with other people right now," although she visits with

them.

Cole's mother, Robbie Johnson, testified that on April 3, Cole and the twins were at her home until the mid-afternoon; that she had awakened around lunchtime that day and nothing was unusual; that Cole and Johnson were arguing after Cole picked him up from work; and that Jordan was fine. She also testified that after Jordan's death, Cole had a "nervous breakdown" and started using cocaine.

(c) Dr. Stephen Messner, the chair of the hospital's child abuse pediatrics department, and Peggy Woodard, a social worker with the Department of Family and Children Services (DFCS) who was called in to assess Jordan's case, both testified about the hospital's investigation. Woodard, together with a hospital fellow working under Dr. Messner's supervision, interviewed Johnson at the hospital. Johnson told Woodard he did not know what had caused Jordan's injury, but guessed that her twin brother had kicked her. He said that Jordan had been acting normally on April 3 but that she had not taken much of her bottle. He said he was alone with the twins from around 6:30 until around 9:30 that evening, when his

8

aunt got home. His aunt saw the twins and all was fine. Johnson said that the twins slept with him in a queen-sized bed and that they went to sleep around 10:00 p.m. A few hours later, Jordan awoke, crying, and he noticed her brother was kicking her. He shifted his son and calmed Jordan, and they went back to sleep. Johnson woke up again around 5:00 a.m. and noticed that his son was situated with his "torso laying on [Jordan]." He moved his son and picked up Jordan, who he realized was unresponsive. So he "shook her lightly" and tried to rouse her with some water; when that didn't work, he went to his aunt, who told him to call 911. Woodard described Johnson's demeanor as "calm," "cooperative," and "relaxed," in contrast to Cole, who was "visibly upset." Johnson said that April 3 was the second time he had had the twins with him overnight by himself. Although Johnson would later claim he accidentally hit Jordan's head against the bed's headboard before they all went to sleep that night, Johnson made no mention of this in his interview with Woodard.

Dr. Messner, who was qualified as an expert in child abuse

pediatrics, testified that Jordan's CT scans showed fractures on the back and both sides of her skull. Based on their length, and the fact that they were "depressed" and exhibited "branching," Dr. Messner opined that they must have been caused by "significant force." Subdural hemorrhages were indicative of trauma characterized by rapid twisting or rotating. These injuries, he opined, could not have been caused by a fall. And nothing that was reported in Jordan's history—getting kicked or rolled on by her brother, light shaking, or a minor bump against a headboard—could have caused the injuries. He opined that Jordan would have shown signs of distress immediately or within moments of sustaining her injuries. In his opinion, her injuries were consistent with physical abuse.

(d) In an interview at the hospital with a DeKalb County police detective, Johnson maintained that he did not know what had happened and that Jordan had been fine the night before, other than refusing to take her bottle. And again he mentioned that Jordan's brother was lying on his sister's head at one point and suggested that perhaps he had kicked or head-butted her during the night. He

10

did not mention anything about accidentally hitting Jordan's head against the headboard.

The lead detective in the case, Gregory Moore, testified that, after Jordan's death, he tried to contact Johnson on April 7 and 8 but could not reach him, and Johnson failed to return the calls. After another unsuccessful try on April 9, Detective Moore obtained an arrest warrant. Johnson was ultimately arrested on April 10 when he appeared in court in an unrelated DFCS proceeding—at which he appeared only after initially failing to show up and being called in by a DFCS case-worker.

Following Johnson's arrest, Detective Moore interviewed Johnson, an audio recording of which was played for the jury. Johnson continued to insist that he had done nothing to hurt Jordan, that he "wasn't rough with" the twins, that Jordan was "fine," and that he did not know what had happened to her. He denied he had ever "put hands on" his kids or any of his romantic partners. He said he "wasn't even angry that night." And he said no accident had happened. He then suggested that "maybe [he] fell asleep and rolled

11

over on her." After a break in the interview, Johnson began with, "I didn't think this was an issue because she didn't cry, but . . ." He went on to explain that at one point in the evening before they went to sleep, he was on the bed with Jordan on his chest when he noticed that her brother had spit up, causing him to react by jumping up and accidentally hitting Jordan's head against the headboard. He said she did not cry, so he laid her on the bed so he could clean up his son. He said he "really forgot" that this had happened, and that "that's the only thing that happened." Detective Moore said Johnson showed little emotion during the interview. Johnson also gave a written statement that tracked what he said in the interview, including the part about the headboard.

(e) The medical examiner who performed Jordan's autopsy, Dr. Gerald Thomas Gowitt, testified that Jordan had significant head trauma but few external injuries, which was not unusual in a case of child abuse. Examination of Jordan's head revealed substantial hemorrhaging and bruising and multiple skull fractures, including a 10-inch fracture running from one side to the other and additional

12

fractures on each side with "tributaries" branching off. The fracture patterns indicated multiple impacts of "considerable force" and were not characteristic of a simple fall; the only possible accidental cause of such injuries would be a car crash or a fall from a great height. There was no evidence that any of these injuries had begun to heal. In addition to the brain injuries, there was retinal hemorrhaging in both eyes, the characteristics of which were "highly suggestive of acceleration and deceleration of the head at high speed."

Dr. Gowitt also testified that once a fatal head injury is inflicted, the symptoms appear almost immediately and are obvious, even to a layperson. So too, he said, for the retinal hemorrhaging; after an injury of that type, a child likely would be unconscious and would not be smiling, cooing, or otherwise responding. Because of the lack of external injuries, Dr. Gowitt opined that it was likely that Jordan had been slammed into something hard, smooth, and broad, and that an adult male would be capable of creating enough force to cause those injuries. According to Dr. Gowitt, six-month-olds have the same sensory nerves as adults, so they have the same ability to

13

feel pain.

Dr. Gowitt concluded that the cause of death was craniocerebral trauma and the manner of death was homicide.

(f) Johnson's counsel cross-examined the State's medical experts about the concept of a "lucid interval," which can occur after a person has suffered head trauma. As these experts testified, head trauma victims typically experience confusion, loss of consciousness, or other symptoms immediately after sustaining the injury, but that initial period is sometimes followed by a "lucid interval" during which the victim appears "asymptomatic," before symptoms reappear. The emergency physician, while agreeing on cross that he could not "rule . . . out medically" the theory that Jordan had experienced a lucid interval, testified on redirect that "you don't suffer this degree of trauma . . . and then have a lucid period." Dr. Messner testified that the "vast majority" of lucid intervals occur when the patient is experiencing epidural bleeding rather than—as

Jordan experienced—subdural bleeding.[3] And Dr. Gowitt opined that Jordan's injuries were not those with which he might expect to see a lucid interval.

Johnson's counsel also unsuccessfully sought, in cross-examining Cole and Cole's mother, to elicit that Cole's sister and brother had been present during the day on April 3 when she and the twins had been at her mother's home. Johnson's counsel did, however, elicit from Woodard that her notes indicated Cole had told her that her brother and sister had been playing with Jordan at their mother's home on April 3.

(g) After the State rested, the defense called its own expert forensic pathologist, Dr. Janice Ophoven, who concluded that Jordan had died from blunt force trauma to the head, "consistent with a single impact," and opined that Jordan could have experienced one or more lucid intervals during which her body was

_____

[3] Dr. Gowitt explained that between the inside of the skull and the outside surface of the brain there are two "spaces": the "epidural" space and the "subdural" space, which lies between the epidural space and the brain itself.

15

"compensating" after sustaining the initial injury. She described the skull fracture as an "eggshell fracture," "characteristic of babies of less than a year because of their deformable skull," and opined that the injury had been inflicted sometime within the 24-hour period before she became unresponsive, the complications from which had, "over time," led to brain swelling and death. Dr. Ophoven opined that the retinal hemorrhages could have been caused by medical intervention and thus were not necessarily indicative of any particular mode of injury. She also opined that the fact that Jordan's twin was found lying on top of her could have affected her injury, and that Jordan's mother's depression and substance abuse were "red flags."

Johnson himself testified, maintaining that he had done nothing to cause his daughter's death or any pain and described himself as having a loving, kind, and peaceful nature. He said he had concerns about Cole's depression and had on a prior occasion reported those concerns to a DFCS worker in connection with a hospital visit for Jordan's twin brother. He recounted Cole's

16

chronology of April 3 from the time Cole picked him up until she dropped him and the twins off at his aunt's home. He said that, after arriving at his aunt's, he played with the twins, watched TV with them, gave them their bottles—although Jordan did not take hers—and then put them to bed. He said Jordan seemed fine that afternoon and evening, aside from refusing her bottle and having a runny nose. He recounted the headboard incident, waking up in the night to find Jordan's brother kicking her, and later waking up to find him lying on top of her, with Jordan unresponsive.

When asked why he had failed to mention the headboard incident until his interview with the detectives, Johnson replied that he "honestly just forgot about it." And when asked about the calls from Detective Moore he never returned, he explained that he "didn't pay attention" to his phone during that time because he was "grieving," and said he had already given a statement to the detective at the hospital. As to why he had not initially appeared at the DFCS proceeding on April 10, he said his family had told him he did not need to be there.

Johnson admitted that he had been convicted of domestic violence in Tennessee in connection with a fight with his ex-wife's cousin, which left the cousin bloodied and momentarily unconscious. He admitted on cross-examination that he told police at the time that he had "snapped." Johnson also admitted that, on one occasion, an argument with Cole had become "physical" and he had given her a black eye. In addition, he admitted that he had been previously convicted of obstruction and giving a false name and that in this case he had violated the condition of his bond that required him not to contact any witnesses.

The defense also presented Johnson's aunt, Sallie White, who testified that she did not notice anything amiss with Jordan on the evening of April 3 and did not hear any commotion or unusual noises during that night. Johnson's father also testified, noting that on the afternoon of April 3 he noticed that Jordan was "not responding" to him but figured she was just sleepy. Various character witnesses, including family, friends, and Johnson's ex-wife, also testified, describing Johnson as loving, kind, and a good father.

2. Johnson contends that the evidence was insufficient, both as a matter of constitutional due process and as a matter of Georgia statutory law, to support his convictions.

(a) When assessing a challenge to the sufficiency of the evidence as a matter of constitutional due process, the evidence presented at trial is viewed in the light most favorable to the verdicts to determine whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of all the crimes of which he was convicted. See *Jones v. State*, 304 Ga. 594, 598 (2) (820 SE2d 696) (2018) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979)). In making this determination, we do not evaluate witness credibility, resolve inconsistencies in the evidence, or assess the weight of the evidence; these tasks are left to the sole discretion of the jury. See *Walker v. State*, 296 Ga. 161, 163 (1) (766 SE2d 28) (2014). The jury's verdicts will be upheld as long as some competent evidence, even if contradicted, supports each fact necessary to make out the State's case. See *Jones*, 304 Ga. at 598 (2).

Here, the evidence viewed most favorably to the verdicts showed that Jordan suffered non-accidental blunt force injuries during a time when Johnson was the only person present and capable of inflicting such injuries. The jury was authorized to not believe Johnson's story, and to credit the medical experts' testimony that Jordan's injuries would have been apparent within a short time after their infliction, and that the theory that Jordan had experienced a "lucid interval" during the afternoon of April 3 was unsound. And the jury was authorized to find that Jordan had experienced cruel and excessive pain from the injuries she sustained. See *Moore v. State*, 283 Ga. 151, 153 (1) (656 SE2d 796) (2008) (noting that "evidence of a child's age, the extent of injuries, the nature of the assault to which the child was subjected, and the force with which the child was struck is sufficient evidence from which the jury can conclude whether the defendant caused the child cruel or excessive physical pain"). Therefore, the evidence was sufficient as a matter of constitutional due process to support Johnson's convictions for felony murder and cruelty to children in

20

the first degree. See id. (affirming convictions for felony murder and first-degree cruelty to children).

(b) A conviction on circumstantial evidence is authorized if the proved facts "exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. "Not every hypothesis is a 'reasonable' one, and the evidence need not exclude every conceivable inference or hypothesis, only the reasonable ones." *Willis v. State*, 315 Ga. 19, 23-24 (2) (880 SE2d 158) (2022) (citation and punctuation omitted). Whether an alternative hypothesis is reasonable and whether the evidence excludes any such hypotheses are questions for the jury, whose findings on those questions must stand unless they are "insupportable as a matter of law." Id. at 24 (2).

Here, the evidence authorized the jury to reject as unreasonable the alternative hypothesis that someone other than Johnson—i.e., Cole or Cole's mother, sister, or brother—caused Jordan's fatal injuries at some point before Johnson assumed her care. There was no evidence that Jordan was exhibiting any signs of

trauma or distress until Johnson called 911, and three medical experts opined that Jordan's symptoms would have begun to manifest immediately or shortly after the trauma—and that a lucid interval was improbable given the nature of her injuries. Johnson contends that the evidence shows Jordan's injuries could just as likely have been the result of an accident as opposed to an intentional act, but the jury was well within its authority to reject that theory as unreasonable. We thus have no basis for disturbing the jury's findings. See *Willis*, 315 Ga. 25 (2).

3. Johnson next contends that the verdict and judgment are "decidedly and strongly against the weight of the evidence."

"Even when the evidence is legally sufficient to sustain a conviction, a trial judge may grant a new trial if the verdict of the jury is 'contrary to . . . the principles of justice and equity,' OCGA § 5-5-20, or if the verdict is 'decidedly and strongly against the weight of the evidence.' OCGA § 5-5-21." *Drennon v. State*, 314 Ga. 854, 860 (2) (880 SE2d 139) (2022) (citation and punctuation omitted). When these so-called "general grounds" are properly raised in a timely

motion for new trial, the trial judge must "exercise a broad discretion to sit as a 'thirteenth juror.'" Id. (citation and punctuation omitted). This role requires the judge to consider matters typically reserved to the jury, including conflicts in the evidence, witness credibility, and the weight of the evidence. See id.

As is plain from the order denying Johnson's motion for new trial, the trial court performed its role as the thirteenth juror. In its order, the court noted that, after considering "[the] conflicts in the evidence, the credibility of witnesses, and the weight of the evidence," "[t]he Court, in an exercise of discretion finds that the verdict was neither 'contrary to evidence and the principles of justice and equity' . . . nor 'decidedly and strongly against the weight of the evidence[.]'" The trial court's decision in this regard is not subject to our review—this Court "does not sit as an arbiter of the general grounds, which are solely within the discretion of the trial court." *Ridley v. State*, 315 Ga. 452, 456 (3) (883 SE2d 357) (2023) (citation

and punctuation omitted).[4] So this claim fails.

4. Johnson contends that the trial court erred by admitting into evidence certain photographs from before and during Jordan's autopsy. Before trial, Johnson moved to exclude the photographs, arguing that they were not relevant and were gruesome and unduly prejudicial under OCGA § 24-4-403. The trial court disagreed and admitted the photographs, over Johnson's objection, when they were tendered at trial.

(a) Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OCGA § 24-4-401. Relevant evidence is generally admissible, see OCGA § 24-4-402, but such evidence "may be excluded if its probative value is substantially outweighed by the

---

[4] Because we have already rejected Johnson's claim that the evidence was insufficient as a matter of constitutional due process under *Jackson v. Virginia*, we need not consider whether it would be proper to analyze Johnson's general-grounds claim by reference to the *Jackson* constitutional sufficiency standard. See *King v. State*, No. S23A0214, slip op. at * __ (2) n.8 (decided June 21, 2023) (noting this Court's past practice of analyzing general-grounds claims by performing or referencing a sufficiency-of-the-evidence review under *Jackson* but declining to determine the propriety of that practice).

danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." OCGA § 24-4-403. That said, "the exclusion of relevant evidence under Rule 403 is an extraordinary remedy that should be used only sparingly." *Albury v. State,* 314 Ga. 459, 461 (3) (877 SE2d 548) (2022) (citation and punctuation omitted). Decisions whether to admit evidence under these rules are "committed to the sound discretion of the trial court." Id. (citation and punctuation omitted).

(b) Five of the six contested photographs were taken during the autopsy. Two of those photographs depicted, from different angles, Jordan's head with the scalp peeled back to show the hemorrhaging beneath the scalp. Three others showed the various fractures on Jordan's skull. At the pretrial hearing, the State told the trial court that Dr. Gowitt had specifically selected those photographs for use during his testimony. During trial, Dr. Gowitt referred to these photographs while describing the hemorrhaging and bruising underneath Jordan's scalp and the multiple fractures, some

25

affecting more than one bone within the skull—all of which, Dr. Gowitt testified, indicated multiple impacts sustained from a non-accidental cause, the effects of which would have been apparent immediately or within a very short period of time.

The trial court did not abuse its discretion in admitting these five photographs. Autopsy photographs may be relevant to show the nature or extent of a victim's injuries. See *Albury*, 314 Ga. at 462 (3); *Lanier v. State*, 310 Ga. 520, 527-528 (4) (852 SE2d 509) (2020). These photographs, which assisted the medical examiner in describing the nature and severity of Jordan's injuries, were highly relevant to the issues of both how and when the injuries were sustained. Because both the timing of the injuries and the manner of their infliction were contested issues in the case, the photographs' probative value was high. See *Albury*, 314 Ga. at 462 (3) (autopsy photograph had "significant probative value" in supporting State's theory of how injuries were inflicted); *Lanier,* 310 Ga. at 527-528 (4) (autopsy photographs admissible where they "corroborated the State's evidence of the circumstances of the killings"). And although

the photographs may have been graphic, we cannot say the trial court abused its discretion in concluding that their probative value was not substantially outweighed by the danger of unfair prejudice. See *Albury*, 314 Ga. at 462 (3) (although photograph of victim's head with scalp and face peeled back may have been "gruesome," trial court did not abuse its discretion in admitting it because of its probative value).

(c) The remaining photograph was taken before the autopsy. This photo showed Jordan as she arrived from the hospital, with various tubes, wires, and a neck collar still attached to her body. The defense argued that the photo was inflammatory because of all the "apparatuses" on Jordan; the State argued that was its "identification" photo, as it had the medical examiner's case number on it, and it was being used to establish that the subject of the autopsy was in fact the victim. After looking through various full body pictures of the victim, the court ruled that the photograph at issue could be used "as an ID shot."

The relevance of the pre-autopsy photograph is questionable

27

given that the victim's identity was not contested and the fact that, unlike the other autopsy photos, it was of little relevance to the victim's injuries, which were largely internal. Cf. *Perez v. State*, 309 Ga. 687, 695 (3) (848 SE2d 395) (2020) (pre-autopsy photos were properly admitted because they showed the nature and location of victim's wounds and thus were probative of "how the killing occurred"). But we need not decide whether admitting the photograph was error, because even assuming it was, the error was harmless.

"Erroneous evidentiary rulings are subject to a harmless-error test." *Jones v. State*, 315 Ga. 117, 122 (4) (880 SE2d 509) (2022). A nonconstitutional error is harmless if it is "highly probable that the error did not contribute to the verdict." Id. (citation and punctuation omitted). The burden to make this showing is the State's to bear, and in determining whether the showing has been made, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have weighed it. Id. (citation and punctuation omitted). Here, the single pre-autopsy photograph was not nearly as

graphic as the five properly admitted autopsy photographs, and the evidence that Jordan's injuries were inflicted on purpose, during a period in which Jordan was under the supervision of Johnson alone, was strong. Under these circumstances, it is highly probable that any error in admitting this single pre-autopsy photograph did not contribute to the verdicts. See *Jenkins v. State*, 270 Ga. 607, 609 (3) (512 SE2d 269) (1999) (even assuming admission of pre-autopsy photos was error, error was harmless in light of overwhelming evidence of defendant's guilt).

5. Johnson next contends that the trial court "erred and violated the Sixth Amendment right of confrontation" by limiting the defense's cross-examination of Cole on certain topics.

Both the United States and Georgia Constitutions guarantee to an accused the right to confront and cross-examine the witnesses against him. See U.S. Const. amend VI; Ga. Const. of 1983, Art. I, Sec. I, Par. XIV. See also *Davis v. Alaska*, 415 U.S. 308, 315 (2) (94 SCt 1105, 39 LE2d 347) (1974); *Miller v. State*, 266 Ga. 850, 856 (7) (472 SE2d 74) (1996). To that end, our Evidence Code affords

29

criminal defendants "the right of a thorough and sifting cross-examination . . . as to the witnesses called against [them]." OCGA § 24-6-611 (b). But "the right of cross-examination is not an absolute right that mandates unlimited questioning by the defense." *Howard v. State*, 286 Ga. 222, 225 (2) (686 SE2d 764) (2009) (citation and punctuation omitted). Trial courts have "wide latitude to impose reasonable limits on cross-examination based on concerns about, among other things, interrogation that is only marginally relevant." *Lucas v. State*, 303 Ga. 134, 137 (2) (810 SE2d 491) (2018) (citation and punctuation omitted). See also OCGA § 24-6-611 (b) (providing that scope of cross-examination extends to "any matter relevant to any issue in the proceeding"). Trial courts also have discretion to limit witness interrogation to "[p]rotect witnesses from harassment or undue embarrassment." OCGA § 24-6-611 (a) (3). We review a trial court's limitation on the scope of cross-examination for abuse of discretion. See *Lucas*, 303 Ga. at 136-137 (2).

Here, Johnson contends that the trial court unduly limited his right to confront Cole on three topics: (1) her purported dishonesty

about the paternity of the twins' half-brother; (2) the fact that she had lost custody of that child as well as Jordan's twin; and (3) Cole's postpartum depression. Johnson contends broadly that, because Cole was a "likely suspect" in Jordan's death, he had the right to "impeach" her on all of these subjects.

Johnson's counsel cross-examined Cole at length on a variety of topics, including her relationship with Johnson, her chronology of the events of April 3 and 4, whether her brother and sister were present at her mother's home on April 3, and her statements to Woodard and to law enforcement on April 4. Johnson's counsel also cross-examined Cole on her drug and alcohol abuse, her pending felony charges, her depression, and the fact that she had lost custody of Jordan's twin and their older half-brother. So Johnson was afforded a "thorough and sifting" cross-examination of Cole as a general matter. And as to the specific topics of Cole's depression and her loss of custody, the trial court allowed Johnson to question Cole about both. The only limitation the court imposed on these topics was on questioning, related to the hospital visit during which

Johnson reported his concerns about Cole's depression, which could have created a false impression about the cause of the hospital visit.[5] This limitation was well within the trial court's discretion. See *Lucas*, 303 Ga. at 138-139 (2).

The trial court also prohibited Johnson's counsel from questioning Cole about her purported dishonesty about the paternity of the twins' half-brother. But although Johnson correctly notes that "[t]he credibility of a witness may be attacked by any party," OCGA § 24-6-607, a defendant does not have carte blanche to question a witness on issues of marginal relevance that are intended primarily to impugn the witness's character or motives. See *Lucas*, 303 Ga. at 138-139 (2) (trial court did not abuse discretion by prohibiting cross-examination of prosecution witness on his immigration status); *Nicely v. State*, 291 Ga. 788, 795-796 (4) (733 SE2d 715) (2012) (trial court did not abuse discretion by

---

[5] The trial court sought to prevent questioning that might have falsely implied that the trip to the hospital resulted from Jordan's twin brother's fall from a chair while unattended, when the actual reason for the trip was his severe constipation.

prohibiting cross-examination of prosecution's medical expert about a purported "understanding among some Georgia medical examiners that one will not testify 'against' the findings of another"). The trial court did not abuse its discretion in prohibiting Johnson from probing into Cole's purported dishonesty about the paternity of her twins' half-brother. See *Lucas*, 303 Ga. at 138-139 (2).

Johnson's claim that he was improperly limited in his ability to cross-examine Cole therefore fails.

6. Johnson contends that the trial court erred in allowing the medical examiner to testify about confessions in child-abuse cases, because that subject was outside the field in which he was qualified as an expert. Dr. Gowitt testified on direct examination that he had been involved with at least 200 cases involving fatally abused children, and that he had done consulting work for defendants in 40 to 50 such cases. He testified that in "about half" of the cases, the defendant had confessed to the abuse; that "perpetrator confessions are something that we read frequently" when doing defense work; and that he was familiar with "many articles" in the "pediatric

33

forensic literature" on confessions by perpetrators of fatal child abuse. Dr. Gowitt testified that, based on his experience and knowledge of the literature, the "majority" of those who confessed "admit that they lost their temper." At this point, defense counsel objected based on relevance, but the court overruled the objection.

Johnson now claims that the court erred in admitting this testimony because it was outside the scope of forensic pathology.[6] But because Johnson did not object on this basis at trial, we review this claim only for plain error. See *Mann v. State*, 307 Ga. 696, 704 (2) (e) (838 SE2d 305) (2020). "To show plain error, an appellant must show that (1) the alleged error was not affirmatively waived, (2) it was obvious beyond reasonable dispute, and (3) it affected the appellant's substantial rights, which ordinarily means showing that it affected the outcome of the trial." *Moore v. State*, 315 Ga. 263, 272-273 (4) (882 SE2d 227) (2022).

---

[6] Johnson also asserts that he had no pretrial notice that Dr. Gowitt's testimony would exceed the scope of his expert qualifications. But because we conclude below that the testimony was within the scope of Dr. Gowitt's qualifications, no such notice was required.

Given Dr. Gowitt's direct experience with confessions in child-abuse cases and his knowledge of the medical literature on the topic, we see no obvious error in the trial court's allowing him to testify on this subject. See *Wellborn v. State*, 258 Ga. 570, 572 (2) (372 SE2d 220) (1988) (no error in allowing expert to testify on a subject that "was within the scope of his field according to his testimony"). And whether or not allowing this testimony was obvious error, Johnson has not shown how allowing the testimony, which fills scarcely two of the almost 100 transcript pages of Dr. Gowitt's testimony, affected Johnson's substantial rights. This claim is without merit.

7. Johnson contends that the trial court erred in excluding testimony from a private investigator about his unsuccessful efforts on behalf of the defense to locate and serve a subpoena on the medical fellow who had assisted in the hospital's investigation into possible child abuse.

Before trial, the defense apparently had tried to locate the medical fellow who had helped conduct interviews with Jordan's family members and had written a report with conclusions, which

Dr. Messner reviewed and approved. According to the defense, the medical fellow was no longer employed with the hospital, and they could not find her. Noting that both Dr. Messner and Woodard had referred to "the information [the fellow] would have in this case," the defense argued that it needed to "demonstrate to the jury that we did make attempts to track her down because we wanted to know what she had to say." The State objected, noting among other things that the defense had failed to ask for a material-witness subpoena for this witness, see OCGA § 17-7-191 (setting out a process by which a criminal defendant may apply to "obtain subpoenas for such witnesses as he deems material for his defense"), and that there was no evidence she had been intentionally evading a subpoena. The trial court excluded the testimony but noted that the defense would be allowed to comment on the State's failure to present the medical fellow as a witness.

Johnson now claims that the exclusion of this evidence violated his due process rights, but in support of this argument he cites only

two provisions of the Evidence Code that plainly do not apply.[7] Particularly given the defense's failure to avail itself of the statutory process for securing the attendance of material witnesses, see id., we see no abuse of discretion in the trial court's refusal to allow testimony on this ancillary topic.

8. Lastly, Johnson contends that the trial court committed plain error by failing to give a jury instruction on accident. See OCGA § 16-2-2 ("A person shall not be found guilty of any crime committed by misfortune or accident where it satisfactorily appears there was no criminal scheme or undertaking, intention, or criminal negligence.").

In his written requests to charge, Johnson asked for an instruction on the affirmative defense of accident. At the charge conference, defense counsel argued that "our defense is that we don't know what happened. There's not enough evidence to rule out.

_____

[7] Johnson cites OCGA §§ 24-8-804 (a) (5) (providing that a hearsay declarant is "unavailable as a witness" if he is absent from the hearing and the proponent of his statement "has been unable to procure [his] attendance") and § 24-9-923 (regarding authentication of recordings and like evidence), neither of which would have offered a basis for the private investigator's testimony.

There's certainly not enough to prove—to prove an intentional act. And we think that there's not enough evidence to rule out accident." But the trial court noted that binding precedent required the defendant to admit to committing the act that caused the victim's death and thus ruled the instruction would not be given. Johnson's counsel relented and said, "OK. No objection." Johnson now contends that the failure to instruct the jury on accident was plain error. See OCGA § 17-8-58 (b) (where a party fails to object to the omission of a jury charge, such omission may be reviewed only for plain error).

The court's refusal to give an accident instruction was consistent with the law in effect at the time of trial, which held that the accident defense "generally requires an admission by the defendant that [he] committed the act that caused the victim's death." *Kellam v. State*, 298 Ga. 520, 522 (2) (783 SE2d 117) (2016) (citation and punctuation omitted). But when we review jury instructions for plain error, we look to the law in effect at the time of our review. See *Lyman v. State*, 301 Ga. 312, 317 (2) (800 SE2d

38

333) (2017) (in the review of asserted plain error under OCGA § 17-8-58 (b), "whether an error is "clear or obvious" is judged at the time of the appellate court's review). And current law is clear that "[a] criminal defendant is not required to 'admit' anything, in the sense of acknowledging that any particular facts are true, in order to raise an affirmative defense." *McClure v. State*, 306 Ga. 856, 857 (834 SE2d 96) (2019). So the reason the trial court gave for refusing to instruct on accident is not correct under current law. And because Johnson's testimony about the headboard incident offered some evidence—albeit slight—from which the jury might have found that Jordan's injuries resulted from an accident, we must conclude that the failure to give an accident instruction was an error that is "obvious beyond reasonable dispute." *Moore*, 315 Ga. at 272 (4). See *Sullivan v. State*, 308 Ga. 772, 778-779 (2) (843 SE2d 411) (2020) (to warrant the giving of a requested jury charge, the evidence supporting the theory of the charge need only be "slight").

Nonetheless, this error was unlikely to have "affected the outcome of the trial." *Moore*, 315 Ga. at 273 (4). Johnson's primary

theory at trial was not that Jordan's injuries resulted from an accident, but that someone else—most likely Cole but possibly anyone else who had contact with Jordan in the 24 hours before the 911 call—inflicted the injuries that caused her death. And although Johnson offered up the headboard incident as a possible explanation for Jordan's injuries, testimony from all of the medical experts— including Johnson's—established that Jordan's injuries were the result of "considerable force" that was plainly inconsistent with Johnson's description of the headboard incident. For this reason, Johnson has failed to establish plain error. See *Sullivan*, 308 Ga. at 778-780 (2) (failure to give accident instruction was harmless where evidence of accident was contradicted by other evidence, including expert testimony, that strongly supported a finding of intentional conduct); *Thomas v. State*, 297 Ga. 750, 753 (2) (778 SE2d 168) (2015) (no plain error in trial court's refusal to give an instruction on accident). See also *McClure*, 306 Ga. at 866-867 (Nahmias, P.J., concurring) (noting that failing to give an instruction on an alternative defense supported by "only the slightest evidence" will

likely be harmless and "almost certainly will not amount to plain error").[8]

*Judgment affirmed. All the Justices concur.*

---

[8] In our analysis, we have assumed that the trial court erred by admitting the pre-autopsy photograph and held that the trial court committed a clear and obvious error by declining to instruct the jury on accident. Johnson has not claimed cumulative error and therefore has not made any specific argument as to why these two errors in combination prejudiced his defense. See *State v. Lane*, 308 Ga. 10, 18 (1) (838 SE2d 808) (2020) ("[A] defendant who wishes to take advantage of the [cumulative error rule] should explain to the reviewing court just how he was prejudiced by the cumulative effect of multiple errors."). In any event, "we discern no apparent cumulative prejudice on this record." *Prickett v. State*, 314 Ga. 435, 445 (3) n.8 (877 SE2d 573) (2022).